SEAFORD et al., Appellees,

v.

**NORFOLK SOUTHERN RAILWAY COMPANY, Appellant.**

[Cite as *Seaford v. Norfolk S. Ry. Co.*, 159 Ohio App.3d 374, 2004-Ohio-6849.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 83137.

Decided Dec. 16, 2004.

376

378

Wallace & Graham, P.A., and Christopher J. Hickey; Kevin E. McDermott, and Mary Brigid Sweeney, for appellees.

Gallagher, Sharp, Fulton & Norman, Holly Olarczuk–Smith, Kevin C. Alexandersen, and Monica A. Sansalone, for appellant.

KARPINSKI, Judge.

{¶ 1} Defendant, Norfolk Southern Railway Company, appeals the jury verdict in favor of plaintiffs, Ralph Seaford and Horace Thomas (collectively, "the workers"). The workers were employed by the railroad for decades and both developed asbestosis, allegedly as a result of their exposure to asbestos in their work in the rail yard.

{¶ 2} The workers filed suit in Cuyahoga County, and the railroad filed a motion to dismiss in reliance on the doctrine of forum non conveniens, which the trial court denied. Following a one-week trial, the jury awarded Seaford $76,000 and Thomas $64,000. Initially, the court reduced Thomas's award by one-third because he had been exposed to asbestos also while working for another employer. After the United States Supreme Court issued its opinion in *Norfolk & W. Ry. Co. v. Ayers* (2003), 538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261, however, the trial court reconsidered its apportionment award and reinstated Thomas's original award of $64,000.

{¶ 3} Meanwhile, the railroad filed a motion for setoff to reflect settlements the workers had received from manufacturers and distributors of asbestos, which the trial court denied. The court also denied the railroad's motion for a new trial, in which the railroad claimed that the court had made several improper evidentiary rulings. The railroad then filed this appeal, presenting seven assignments of error, the first of which states:

> The trial court lacked judicial authority and subject matter jurisdiction to preside over the proceedings in this matter. Thus, any judgment entered in this matter is void.

## A. Whether a Violation of the Ohio Constitution Occurred

{¶ 4} The railroad claims that because the visiting judges who heard the case had been appointed permanently to the asbestos docket in violation of the Ohio Constitution, they lacked jurisdiction to hear the case. Its basic argument is that "there is a constitutional unfairness about the process employed to manage the asbestos cases in Cuyahoga County." The railroad argues that because the same two judges have been appointed repeatedly to the asbestos docket, "their assignment becomes de facto permanent in violation of the Ohio Constitution."

{¶ 5} The Ohio Supreme Court is granted the power to appoint judges in the Ohio Constitution:

> The chief justice or acting chief justice, as necessity arises, shall assign any judge of a court of common pleas or a division thereof temporarily to sit or hold court on any other court of common pleas or division thereof or any court of appeals or shall assign any judge of a court of appeals temporarily to sit or

hold court on any other court of appeals or any court of common pleas or division thereof and upon such assignment said judge shall serve in such assigned capacity until the termination of the assignment. Rules may be adopted to provide for the temporary assignment of judges to sit and hold court in any court established by law.

Section 5(A)(3), Article IV. The Constitution further provides for the use of retired judges as appointed judges:

No person shall be elected or appointed to any judicial office if on or before the day when he shall assume the office and enter upon the discharge of its duties he shall have attained the age of seventy years. Any voluntarily retired judge, or any judge who is retired under this section, may be assigned with his consent, by the chief justice or acting chief justice of the supreme court to active duty as a judge and while so serving shall receive the established compensation for such office, computed upon a per diem basis, in addition to any retirement benefits to which he may be entitled. Laws may be passed providing retirement benefits for judges.

Section 6(C), Article IV. Finally, the Constitution addresses the election of judges:

The judges of the courts of common pleas and the divisions thereof shall be elected by the electors of the counties, districts, or, as may be provided by law, other subdivisions, in which their respective courts are located, for terms of not less than six years, and each judge of a court of common pleas or division thereof shall reside during his term of office in the county, district, or subdivision in which his court is located.

Section 6(A)(3), Article IV.

{¶ 6} The appointment of judges and the election of judges are mutually exclusive concepts. As the Ohio Supreme Court noted in another case concerning an objection to an appointed judge, "[t]he record conclusively demonstrates that Judge McMonagle's assignment was made in accordance with Section 6(C), Article IV of the Ohio Constitution. Moreover, that portion of Section 6(A)(3), Article IV, pertains only to the election of judges and not to the temporary assignment of a judge having been duly elected and subsequently retired under Section 6(C), Article IV of the Constitution." *State ex rel. Berger v. McMonagle* (1983), 6 Ohio St.3d 28, 31, 6 OBR 50, 451 N.E.2d 225.

{¶ 7} The railroad does not claim that the judges in this case were not duly appointed in accordance with the Constitution. In fact, it concedes that the judges were appointed by the Chief Justice and attaches copies of those appointments to its brief. Rather, it says that the repeated use of the Supreme Court's constitutional power of appointment violates the section of the Constitution concerning the election of judges. Thus, it argues that the court lacked subject

matter jurisdiction over the case and that therefore the court's decision is void. The railroad does not argue that the common pleas court itself lacked jurisdiction over the case; rather, it argues that because these two judges have been appointed repeatedly to the asbestos docket, "the appointment of Judges Hanna and Spellacy as Cuyahoga County trial judges has become permanent in nature in violation of the Ohio Constitution."

{¶ 8} The only law the railroad cites to support this alleged constitutional violation does not address the constitutionality of the Chief Justice's actions at all. First, the railroad cites *State ex rel. Kline v. Carroll* (2002), 96 Ohio St.3d 404, 775 N.E.2d 517. Although the court in *Kline* held that the verdict of the Lakewood court was void because the case was not properly reassigned pursuant to R.C. 2937.20, and that "challenging improper assignment and transfer of a case is an attack on the subject-matter jurisdiction of the transferee court," the case in *Kline* had been transferred by an administrative judge from one municipal court to another. *Kline* at ¶ 27. The *Kline* court also held that "[b]ecause former R.C. 2937.20 is inapplicable to a municipal court judge who disqualifies himself without an affidavit having been filed against the judge, the Chief Justice of the Ohio Supreme Court possesses the exclusive authority to appoint another judge in these circumstances." Id. at ¶ 23. In the case at bar, the Chief Justice appointed the judge the railroad objects to. *Kline,* therefore, is not applicable.

{¶ 9} The railroad also relies on *State v. Keith,* Cuyahoga App. No. 81125, 2002-Ohio-7250, 2002 WL 31875968. In *Keith,* however, the court's ruling was held to be void because "[w]hile the Ohio Constitution and the Rules of Superintendence allow for the temporary assignment of visiting judges, no such assignment is evident from the record in this case. [The allegedly assigned judge] was, therefore, without authority to enter the order granting the state's motion to dismiss." (Footnote omitted.) *Keith* at ¶ 6. Again, the railroad does not claim that the Chief Justice did not assign the judges in this case or that the record fails to reflect that appointment. The focus of the railroad's argument is that the Chief Justice lacked the authority to make what the railroad deems to be permanent appointments instead of temporary ones. This issue was not the issue addressed in *Keith. Keith,* therefore, is not applicable.

{¶ 10} Finally, the railroad argues that the Chief Justice improperly had made a permanent appointment of a visiting judge. In support, the railroad cites *Silverman v. Am. Income Life Ins. Co.* (Dec. 18, 2001), Franklin App. Nos. 01AP–338 and 01AP–339, 2001 WL 1607635, in which the court held:

> The record does not substantiate plaintiffs' claim that the visiting judge was appointed as a permanent visiting judge. Certificates of assignment reflect that on at least fourteen occasions between October 1997 and March 2001, the Chief Justice of the Ohio Supreme Court appointed that particular visiting

judge, a retired judge of a different county's common pleas court, to preside in the Franklin County Court of Common Pleas. However, each of the assignments was for specific cases or for specified, limited time periods, with any proceedings in which he participated to be concluded, if necessary, after the specified period ended. The assignments, although numerous, were for limited time periods and were therefore temporary in nature, not permanent.

Id. at * 16. The railroad argues that the judge's appointment in the case at bar is not limited in the way the appointment was limited in *Silverman*, because the continuous nature of the asbestos judge's service makes him a permanent judge. The railroad is not able, however, to point to any statute or rule prohibiting the repeated appointment without interruption of a particular judge to a district.

## B. Guidelines for Assignment of Judges

{¶ 11} To support its position, the railroad points to the Guidelines for Assignment of Judges as stating that " 'the Chief Justice will assign * * * a retired judge for *no longer than two months.*' " (Emphasis added by appellant.) First, the guideline the railroad cites states, "*Ordinarily,* the Chief Justice will assign * * * a retired judge for no longer than two months." (Emphasis added.) Guideline 8, 95 Ohio St.3d LXXXI. The word "ordinarily" implies that two-month terms are customary but are not necessarily the only length. There might be other than ordinary circumstances for longer terms.

{¶ 12} Second, the Guidelines provide an exemption for the Chief Justice. The first Guideline states that "[w]hile these Guidelines may impose specific duties upon other persons, the Chief Justice may waive compliance with any Guideline" in the exercise of his discretion.

{¶ 13} Finally, this set of Guidelines does not govern assignments during the time period of the case at bar. The version of the Guidelines the railroad cites did not take effect until 2002; the introduction to those Guidelines explicitly states: "The March 1, 2002 revisions apply to assignment requests made on or after March 1, 2002 * * *." 95 Ohio St.3d LXXIX. The case was first filed on August 28, 1999. Any argument as to the assignment of a judge to the case at bar, therefore, would have had to cite Guidelines effective on that date. The Guidelines in effect at that time are found at 37 Ohio St.3d xxxix.

{¶ 14} Moreover, the introductions to both the old and the new versions of the Guidelines state, "The Guidelines have not been adopted as rules pursuant to Article IV, Section 5 of the Ohio Constitution." The Guidelines, therefore, are just that: a guide for the assignment of judges. Nothing the railroad has cited provides any support for the assertion that the continuous appointment of the same retired judges to the asbestos docket violates the Constitution or even violates any rules of the court.

{¶ 15} It is well settled that the act of appointing a visiting judge to hear a case is not unconstitutional. *Pocker v. Brown* (C.A.6 1987), 819 F.2d 148, 149 (finding no federal constitutional violation); *State ex rel. Berger v. McMonagle* (1983), 6 Ohio St.3d 28, 30–31, 6 OBR 50, 451 N.E.2d 225 (finding no state constitutional violation); *Hewlett v. Cincinnati Univ. Hosp.* (Mar. 21, 1989), Franklin App. No. 88AP–687, 1989 WL 27158.

## C.  Jurisdiction of Appellate Courts to Review Appointments

{¶ 16} Moreover, even if, arguendo, the Chief Justice erred in appointing these judges, we are without jurisdiction to review the issue.  As the Fourth Appellate District has stated:

> To the extent that [appellant] seeks in this court to question the propriety of the Chief Justice's assignment of Judge Clark, our conclusion is that that is not a proper subject of our appellate review.  With respect to the assignment of an out-of-county judge to a court of common pleas, Civ.R. 63 merely implements the grant of power found in Section 5(A)(3), Article IV of the Ohio Constitution. That provision authorizes the Chief Justice of the Supreme Court, and no one else, to assign a common pleas judge from out of county to a single-judge division.  We find nothing in that constitutional grant of power to suggest that an inferior court, such as this court of appeals, is authorized to review the propriety of the Chief Justice's exercise of the power of assignment granted to him by Section 5(A)(3), Article IV, Constitution.

*Adkins v. Adkins* (1988), 43 Ohio App.3d 95, 96–97, 539 N.E.2d 686.

## D.  Failure to Object in the Trial Court

{¶ 17} The record does not reflect any motion, oral or written, objecting to the authority of the judge hearing the case.  Further, the appropriate means for objecting to the authority of an assigned judge is through a motion for mandamus and prohibition.  The Ohio Supreme Court has held that a judge's right to hear a case cannot be questioned in a collateral proceeding to which the judge is not a party.  The court specifically ruled that an appeal from an adverse ruling constituted a collateral proceeding if the appeal challenged the authority of the judge who heard the case.  *State ex rel. Sowell v. Lovinger* (1983), 6 Ohio St.3d 21, 23, 6 OBR 18, 450 N.E.2d 1176, citing *Stiess v. State* (1921), 103 Ohio St. 33, 132 N.E. 85.  The railroad may not, therefore, "appeal from an adverse judgment rendered in the underlying action" by questioning the authority of the appointed judge.  *Lovinger*, 6 Ohio St.3d at 23, 6 OBR 18, 450 N.E.2d 1176. Instead, "until a de facto officer is properly challenged in a quo warranto proceeding and thereby removed from office, his actions are as valid as those of a

de jure officer." *State v. Staten* (1971), 25 Ohio St.2d 107, 110, 54 O.O.2d 235, 267 N.E.2d 122, citing *Ex Parte Strang* (1871), 21 Ohio St. 610, 1871 WL 95.

{¶ 18} The railroad cannot now for the first time, therefore, attack the jurisdiction of the visiting retired judges on appeal. See, also, *Huffman v. Shaffer* (1984), 13 Ohio App.3d 291, 13 OBR 356, 469 N.E.2d 566. "Clearly, the decision by the [appellants] to proceed without challenge or objection concerning the appointment of [the visiting judge] renders any possible error waived." *Williams v. Banner Buick, Inc.* (1989), 60 Ohio App.3d 128, 134, 574 N.E.2d 579.

{¶ 19} Even if the judges had been improperly assigned, furthermore, their exercise of apparent authority can make them de facto judges.

[W]here a judge delegates judicial authority under a color of right but the delegation of authority is defective, either because the judge lacked the requisite legal authority to make the delegation or because of a defect or irregularity in the appointment procedure, the person to whom the judicial authority is transferred may become a "de facto" judge, rather than a "de jure" judge.

*Huffman v. Huffman*, Franklin App. Nos. 02AP–101 and 02AP–698, 2002-Ohio-6031, 2002 WL 31466435, citing *State ex rel. Witten v. Ferguson* (1947), 148 Ohio St. 702, 708–709, 36 O.O. 285, 76 N.E.2d 886.

{¶ 20} As the *Witten* court explained, "[a] de jure officer is one who occupies his office through a proper and legal election or appointment and during a constituted term." *Witten*, 148 Ohio St. at 707, 36 O.O. 285, 76 N.E.2d 886. A de facto judge, on the other hand, "has all the power and authority of a 'de jure' judge, and judicial actions taken by a 'de facto' judge are legally valid and binding and not subject to collateral attack or to challenges first raised on appeal." *Huffman*, 2002-Ohio-6031, at ¶ 34, citing *Williams v. Banner Buick, Inc.*, 60 Ohio App.3d at 134, 574 N.E.2d 579. "[T]he acting judge, by having 'colorable' authority, is deemed a de facto judge with all the power and authority of a proper de jure judge. Consequently, actions taken by [the visiting judge] are legally valid and binding." *Banner Buick*, supra, 60 Ohio App.3d at 134, 574 N.E.2d 579.

{¶ 21} Failure to even object or raise the issue of the visiting judge's jurisdiction is fatal to this claim on appeal. In a case in which a party appealed the issue of the authority of the assigned judge, the Ninth Appellate District held that by failing to object to the assignment before the judge took any action in the case, the party waived its right to raise the issue on appeal. *Boling v. Valecko* (Feb. 6, 2002), Summit App. No. 20464, at 6, 2002 WL 185182, citing *White v. Summit Cty.* (2000), 138 Ohio App.3d 116, 118, 740 N.E.2d 688, quoting *Berger v. Berger* (1981), 3 Ohio App.3d 125, 131, 3 OBR 141, 443 N.E.2d 1375. "[A]ny procedural irregularities that may attend a transfer of a case [to a visiting judge]

are waived unless asserted in a timely manner. 'A party cannot await the decision with knowledge of the procedural irregularity before choosing to object to the defect if the decision is unfavorable.'" *Wissel v. Ohio High School Athletic Assn.* (1992), 78 Ohio App.3d 529, 533, 605 N.E.2d 458, quoting *Berger v. Berger,* 3 Ohio App.3d at 130, 3 OBR 141, 443 N.E.2d 1375. See, also, *Adkins,* supra.

{¶ 22} In summary, by failing to raise this issue before the appeal, the railroad has waived it. It submitted to the authority of the visiting judges when it participated in the trial without objecting to the judges' authority. Further, the railroad has failed to demonstrate any error in the procedure that the common pleas court and the Chief Justice followed in the appointment of these judges. It has also failed to point to any law to support its assertion that the appointment of these judges was unconstitutional. Finally, it failed to demonstrate that this court has the authority to address the issue of the validity of an appointment by the Chief Justice.

{¶ 23} Accordingly, this assignment of error is overruled.

{¶ 24} For its second assignment of error, the railroad states:

The trial court erred when it denied appellant's motion to dismiss on the basis of forum non conveniens.

{¶ 25} The railroad argues that the trial court should have dismissed this case because the forum was not convenient for any of the parties. It raises the same arguments that it raised in *Hess v. Norfolk S. Ry.* Co., 153 Ohio App.3d 565, 2003-Ohio-4172, 795 N.E.2d 91: that none of the workers lived in Ohio, that the rail yard where the workers were exposed to asbestos was in North Carolina, that it is a Virginia corporation, and that it had to depose numerous parties in North Carolina. The railroad raised these issues both in its written motion to dismiss as well as in its oral arguments prior to trial.

{¶ 26} The workers respond by citing the trial court's stated reasons for denying the motion to dismiss for forum non conveniens. In its reply brief, the railroad claims that because the transcript of the hearing on this issue is not part of the stipulated record which is before this court, we cannot consider the workers' arguments.

{¶ 27} The railroad is partially correct; we cannot consider the court's comments that are not properly before us. The logic of an argument, however, does not depend upon its source. Moreover, we cannot review facts underlying the court's decision if we do not have the transcript of the hearing in which those facts were presented.

{¶ 28} "Absent relevant evidence, an appellate court must presume the regularity of the trial court's proceedings and judgment." *Natl. City Bank v. Beyer* (2000), 89 Ohio St.3d 152, 160, 729 N.E.2d 711, citing *Wells v. Spirit Fabricating, Ltd.* (1996), 113 Ohio App.3d 282, 288–289, 680 N.E.2d 1046. Because we do not have the transcript in which the facts upon which the claim of non conveniens was presented, we must presume that the court's judgment was correct.

{¶ 29} App.R. 9(B) is quite clear as to the responsibility of the appealing party: "At the time of filing the notice of appeal the appellant, in writing, shall order from the reporter a complete transcript or a transcript of the parts of the proceedings * * * as the appellant considers necessary for inclusion in the record * * *." App.R. 9(B). The parties in the case at bar stipulated to the record as it was filed on appeal. If the railroad intended to argue the issue of forum, it was required to provide this court with the portion of the record it needed to address the trial court's ruling.[1] Absent the transcript of the hearing on the motion, we are constrained to affirm the decision of the trial court. *Natl. City Bank v. Beyer*, 89 Ohio St.3d at 160, 729 N.E.2d 711. Accordingly, this assignment of error is overruled.

{¶ 30} For its third assignment of error, the railroad states:

The trial court erred to the prejudice of appellant when it precluded appellant from introducing evidence that the manufacturers of asbestos products made representations to appellant that their products were safe and erroneously allowed appellees to introduce into evidence scientific studies that did not relate or in any way reference the railroad for the purpose of establishing that these studies provided notice to the railroad that exposure to asbestos could pose a harm to its workers, which unfairly prejudiced appellant.

{¶ 31} The railroad challenges the trial court's exclusion of pamphlets it claims it received from the asbestos manufacturers and the exclusion of testimony of its expert, Dr. Weir, concerning the railroad's alleged lack of notice of the dangers of asbestos because of its reliance on those pamphlets.

{¶ 32} "The decision of whether or not to admit evidence rests in the sound discretion of the court and will not be disturbed absent an abuse of that discretion." *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 437, 715 N.E.2d 546, citing *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296,

---

1. The record before us contains only defense counsel's statement that "as a matter of course I want to preserve the railroad's objection to this trial going forward on the basis of forum non conveniens. Those motions were filed at the beginning of this case. They were fully briefed by both sides and there were arguments heard and the railroad lost that motion, but we want to preserve it for appeal purposes."

299, 587 N.E.2d 290. Evidence must be relevant to be admissible. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Even if evidence is relevant, however, if its prejudicial effect outweighs its value, it might not be admissible. The rules provide the following distinction:

(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

Evid.R. 403. The railroad argues that the pamphlets it tried to introduce were relevant and that the testimony of the worker's expert witness was unduly prejudicial and irrelevant.

{¶ 33} Again, the railroad presented an identical assignment of error in *Hess.* In both this trial and the one in *Hess,* the railroad attempted to introduce into evidence pamphlets that the railroad allegedly had received from asbestos manufacturers claiming that the asbestos was not harmful. In both cases, the railroad tried to have the same expert witness, Dr. Weir, testify as to the contents of the pamphlets. And in both cases, the trial court refused to admit both the pamphlets and testimony about them because Dr. Weir was not employed by the railroad when it allegedly received the pamphlets and because no employee of the railroad was available to testify concerning when the railroad received them. The court therefore excluded the pamphlets as hearsay. As the *Hess* court noted,

The testimony of Dr. Weir goes directly to the knowledge and notice of the appellant regarding the safety of the asbestos products at issue. Clearly, any evidence that the asbestos manufacturers either did or did not provide adequate warnings to Norfolk regarding the health risks of asbestos goes directly to the issue of foreseeability. However, to introduce a pamphlet into evidence to prove the actual knowledge of the appellant requires that a proper foundation be laid. The trial court excluded introduction of this evidence, stating, "If he had a circular in the hands of a railroad person who said he got, and relied on it and bought the product, it's in. This is hearsay, it's out."

A proper foundation would include a witness from Norfolk who had actual knowledge of the following: who at the railroad received the pamphlet, when the pamphlet was received, and whether Norfolk relied on the information in the pamphlet. Clearly, because he lacked actual knowledge pertaining to the pamphlet, the appellant's expert is not the proper witness to introduce informa-

tion contained in a pamphlet that was supposedly given to "someone" at Norfolk, proclaiming that asbestos products were safe. * * * Furthermore, the trial court would have admitted this evidence if introduced through a proper witness and with a foundation to prove its reliability.

*Hess,* 153 Ohio App.3d 565, 2003-Ohio-4172, 795 N.E.2d 91, at ¶ 46–47.

{¶ 34} In the case at bar, the railroad failed to provide a proper foundation for the introduction of these pamphlets and, therefore, for the expert's testimony regarding them. The reasoning of this court in *Hess* applies, therefore, to this case. Because the pamphlet and Dr. Weir's testimony are hearsay without a foundation, they are inadmissible. The trial court did not err in excluding it.

{¶ 35} Under this assignment of error, the railroad also disputes the trial court's admission of the testimony of the workers' expert, Dr. Ellenbecker. Again, "[t]he admission or rejection of evidence concerning out-of-court experiments is a matter peculiarly within the discretion of the trial court, and reviewing courts will not interfere absent an abuse of discretion." *Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 529 N.E.2d 1382, syllabus, approving *St. Paul Fire & Marine Ins. Co. v. Baltimore & Ohio RR. Co.* (1935), 129 Ohio St. 401, 2 O.O. 396, 195 N.E. 861.

{¶ 36} The railroad objects to Ellenbecker's testimony concerning the level of knowledge available in the professional community concerning the dangers of asbestos as early as the 1900s. This issue was also addressed and overruled in *Hess.* Although the expert plaintiffs used in *Hess* was a different person, both experts testified as to the level of knowledge available in the professional community concerning the dangers of asbestos as early as the 1900s. The railroad argues that it is unfair to impute to the railroad the knowledge available to other industries, and it points out that the first study on asbestos in the railroad industry was not published until 1983. Seaford's exposure to asbestos occurred during his employment with the railroad between 1949 until 1987. Thomas's exposure while employed with the railroad occurred between 1963 and 1995. As this court stated in *Hess,* however,

> That a study did not come from the railroad industry until 1983, which stated that exposure to asbestos is harmful to one's health, does not give the railroad the right to hide its head in the sand and pretend that asbestos exposure was not known to be harmful for the past 43 years. What other industries knew, published, and circulated about the dangers of asbestos, the railroad also should have known.

Id., 153 Ohio App.3d 565, 2003-Ohio-4172, 795 N.E.2d 91, at ¶ 51. We find the reasoning in *Hess* to be sound. The trial court did not abuse its discretion in its ruling to admit the testimony of the worker's expert regarding the industry's

knowledge of the danger of asbestos. Accordingly, this assignment of error is without merit.

{¶ 37} For its fourth assignment of error, the railroad states:

The trial court erred to the prejudice of appellant when it excluded the testimony of appellant's industrial hygienist.

{¶ 38} The railroad sought to introduce expert testimony from an industrial hygienist, Mr. Liukonen, concerning air quality tests he had run in rail yards, engines, and cabooses. He also intended to testify about studies by others. The trial court held a voir dire of his proposed testimony and ruled that he would not be permitted to testify about test results from studies by other persons. It also ruled that he could not testify about tests in which the circumstances of the testing were significantly different from the conditions that the workers experienced.

{¶ 39} Expert testimony is governed by Evid.R. 702, which states:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Liukonen's qualifications were undisputed. He thus fulfills the requirements of Evid.R. 702(A) and (B). What is challenged is whether the methods and principles he used to reach his result are reliable.

{¶ 40} The railroad relies on *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735, to support the admissibility of Liukonen's experiments. The *Miller* court held, "When an out-of-court experiment is not represented to be

a reenactment of the accident and deals with one aspect or principle directly related to the cause or result of the occurrence, the conditions of the accident need not be duplicated." Id., paragraph two of the syllabus. The *Miller* court, while it did not require that the exact conditions be recreated, did require that the out-of-court experiment deal "with one aspect or principle directly related to the cause or result of the occurrence." Id. at 615, 687 N.E.2d 735.

{¶ 41} Here, the experiments Liukonen relies on were too different from the conditions the workers experienced to be reliable. In fact, the experiments did not deal with any aspect or principle of the conditions that the workers allege caused their asbestosis. One of the experiments that Liukonen intended to discuss was a test that someone else had run on asbestos brake shoes. As this court noted in *Kilbane v. Consol. Rail Corp.*, 2004-Ohio-134, 2004 WL 63922, the results of that particular test were not admissible, because the expert quantified the amount of asbestos released only when the brakes were applied.[2] As the trial court noted in the case at bar, the brake shoe test did not involve a comparable activity of the workers, whose duties, in addition to beating on the brake shoes to change them, included tearing off asbestos from heat shields and removing tape from asbestos.

{¶ 42} Another test that the court excluded concerned an asbestos heat shield in the caboose. Liukonen testified that he examined a heat shield that was encased in cement and found it was not friable, that is, able to be crumbled with his fingers. The workers had testified, on the other hand, that the heat shields they had dealt with were friable and were not encased in cement. Explaining that "[t]he heat shield is not the same as the heat shield these men complain of," the court properly excluded Liukonen's testimony on the heat shield, as well as on the brake shoes.

{¶ 43} Liukonen also intended to testify about the absence of airborne asbestos at rail yards he had examined. Excluding this testimony, the trial court described the time frame in which the tests Liukonen intended to testify about were conducted: the tests were performed as much as 40 years after the beginning of the workers' exposure. The court concluded that there was no evidence that the conditions of the rail yards at the time the experiments were performed replicated the conditions of the rail yards at the time the workers were exposed to them. The court held, therefore, that Liukonen would not be allowed to testify about the conditions of a different rail yard several decades later.

---

2. Although in cross-examination the workers' counsel referred to a report by Liukonen, the railroad did not include the report in its exhibits. We do not, therefore, have the report before us.

{¶ 44} Finally, Liukonen intended to testify that the asbestos tape that was wrapped around pipes in the cabooses of the trains was not friable and did not give off asbestos fibers. Again, however, the test he performed on the tapes did not involve tearing the tape or repairing it. He also tested tape in a refrigerated car, not in a caboose. The workers testified that for up to 40 years, they had used the pipes as a footrest and had seen the tape on the pipes tattered and torn. The expert was not prepared to testify about tape in this condition.

{¶ 45} The trial court did not err in excluding Liukonen's testimony. His tests were not relevant, because they examined the air around undisturbed products made of asbestos, whereas the workers' exposure involved those products when they were torn, damaged, or being removed by strong hammer blows. Tearing a product from a heat shield, hammering it to remove it from a brake, or disturbing it through repeated pressure from booted feet provided conditions so unlike those of Liukonen's experiments that the court could properly conclude that his experiments did not deal with circumstances directly related to the cause of the workers' asbestosis. Accordingly, this assignment of error is overruled.

{¶ 46} For its fifth assignment of error, the railroad states:

The trial court erred to the prejudice of appellant when it permitted appellees to introduce answers to interrogatories in an unrelated twenty year old Tennessee lawsuit as rebuttal testimony which was never disclosed to appellant prior to trial and was not listed in appellee's trial exhibit list.

{¶ 47} After the railroad had presented its case, the court permitted the workers, over the railroad's objection, to present rebuttal testimony in the form of the railroad's answers to interrogatories from a Tennessee case from 1983. These interrogatories were submitted by another worker with an asbestos claim in the 1983 case. The railroad objects to their admission because they were not on the workers' trial exhibit list and were not disclosed before trial.

{¶ 48} The railroad also argues that because the workers presented evidence in their case-in-chief to show that the railroad had knowledge of the dangers of asbestos, they could not introduce new evidence to prove that issue on rebuttal. The railroad points out that because the workers' case-in-chief required them to prove that the railroad had knowledge of the dangers of asbestos, the interrogatories introduced on rebuttal should be limited to their case-in-chief.

Admission of rebuttal testimony is a matter within the sound discretion of the trial court and its judgment will not be reversed absent a clear showing of an abuse of that discretion with attendant material prejudice to the defendant. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126, 130. Thus, a trial court's decision regarding the admission of rebuttal testimony will not be reversed unless the trial court's decision was unreasonable,

arbitrary or unconscionable. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 108, 543 N.E.2d 1233, 1237.

*State v. Berenyi* (Sept. 19, 2000), Allen App. No. 1–99–87, at 32–33, 2000 WL 1344559.

{¶ 49} The general rule concerning rebuttal evidence was explained by the Ohio Supreme Court: "A party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." *Phung v. Waste Mgmt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286.

{¶ 50} The presentation of evidence is controlled by R.C. 2315.01, which states:

When the jury is sworn, unless for special reasons the court otherwise directs, the trial shall proceed in the following order except as provided in section 2315.02 of the Revised Code:

(A) The plaintiff concisely must state the plaintiff's claim, and briefly may state the plaintiff's evidence to sustain it.

(B) The defendant must then briefly state the defendant's defense, and briefly may state the defendant's evidence in support of it.

(C) The party who would be defeated if no evidence were offered on either side, first, must produce that party's evidence, and the adverse party must then produce the adverse party's evidence.

(D) The parties then shall be confined to rebutting evidence, unless the court for good reasons, in the furtherance of justice, permits them to offer evidence in their original cases.

{¶ 51} As one court noted, "The purpose of a rebuttal witness is to 'explain, refute or disprove new facts introduced into evidence by the adverse party.' *State v. McNeill* (1998), 83 Ohio St.3d 438, 446 [700 N.E.2d 596]. The testimony of a rebuttal witness is only relevant to challenge the evidence introduced by the opponent, and the scope of this testimony is limited to such evidence. Id." *State v. Hunt,* Summit App. No. 21515, 2003-Ohio-6120, 2003 WL 22715616, at ¶ 23. In *Hunt,* the court permitted rebuttal testimony to impeach claims by the defense witnesses concerning the defendant's claims that he never had threatened the victim. The court permitted rebuttal testimony, stating, "As this evidence is relevant to refute defense evidence, we conclude that the trial court did not abuse its discretion when it permitted the State to introduce evidence through its rebuttal witness." Id. at ¶ 24.

{¶ 52} When counsel was discussing the admission of these interrogatory answers, the counsel for the workers stated that the interrogatory evidence

rebuts what Dr. Weir and Mr. Liukonen [the railroad's expert witnesses] came in and said [sic] they want to talk about TLV's [recommended threshold limit

value of asbestos in the air].[3]  * * * But when we asked the railroad during the period of time that these men worked, did you ever take any TLV's, did you ever take any dust counts, no.  They didn't.  It's rebuttable evidence.
* * *

Then as to the claim agents, what they are going to do is get up and argue we never knew there was any disease.  Well, all right.  Fine.  That's their claims records retention policy.  It only goes back ten years.  If the jury is going to hear that they didn't have any claims, the jury should hear that when they kept their records that that doesn't change, no matter what case you are in.

(Footnote added.)  The interrogatory answers specifically undermine the railroad's claim as part of its defense that it did not have knowledge of the danger and had not received notice of claims prior to the first published study of asbestos in rail yards.  The workers state that they sought to introduce these interrogatory answers to prove that the railroad's assertions in its defense were without basis.

{¶ 53} The workers also sought to introduce the interrogatories to show that the railroad's assertion that it did not know of any asbestos injuries to its workers prior to 1983 was disingenuous.  The interrogatory answer stated that its records prior to 1973 had been destroyed and, therefore, any prior claims could not be substantiated as true or false.  In its opening statement, the railroad claimed that "the railroad was not seeing any incidents of asbestos-related disease" prior to 1983.  This assertion goes well beyond any evidence that was produced.  Because the railroad did not preserve its records, it could not say what it saw prior to 1973.[4]  The workers presented a colorable argument, therefore, that the interrogatories were proper rebuttal evidence against the specific claim that defendants lacked knowledge of prior claims.

{¶ 54} In a Sixth Appellate District case, the trial court permitted rebuttal evidence that could have been admitted in the case-in-chief.  In *Obenour v. Bower* (Aug. 19, 1994), Lucas App. No. L–93–319, 1994 WL 455667, a landlord sued a tenant for nonpayment of rent.  The tenant's defense consisted, in part, of a claim that the landlord was not the rightful owner of the property.  Although the landlord presented witnesses who testified that he owned the property, the

---

3.  The definition of "TLV" is found in *Beavercreek Local Schools v. Basic, Inc.* (1991), 71 Ohio App.3d 669, 686, 595 N.E.2d 360.

4.  Additionally, defendant's expert Dr. Weir testified that there was no evidence of any railroad worker having an asbestos-related claim in the United States until the late 1970s.  His testimony would also be limited to records that he had, but he did not have all the records for that crucial period.  He could report only on what was in the American Association of Railroads' records, and those records were limited to what the railroad had reported to it.

defendant argued that without a copy of the deed, the ownership was not proven. The trial court permitted the landlord to present a copy of the deed on rebuttal, although he could have presented it in his original case. The court held that "it is within the discretion of the trial court to permit or deny the presentation of evidence that is part of a party's case in chief after that party has rested. Accordingly, unless the trial court's attitude in allowing appellee to provide documentary evidence of his ownership after he rested his case is unreasonable, arbitrary or unconscionable, this court cannot disturb the lower court's judgment." (Citation omitted.) Id. at * 2.

{¶ 55} Indeed, Evid.R. 611 provides the trial court with discretion in determining the order of presenting evidence. However, the rule specifies three criteria:

(A) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

{¶ 56} In a Ninth Appellate District case, the court allowed rebuttal testimony concerning the state's case-in-chief against a defendant on trial for driving under the influence. Although the state had the burden of proving defendant's intoxication, "[r]ebuttal testimony is properly offered to refute evidence offered by the adversary. Furthermore, a trial court enjoys discretion over the control of the presentation of evidence. Evid.R. 611(A). Given the trial court's discretionary authority to control the presentation of evidence, we cannot say the trial court erred. [Defendant] did introduce evidence tending to establish his sobriety. The trial court properly allowed the prosecution to rebut this defense by admitting the hospital record into evidence." (Citation omitted.) *State v. Perry* (1996), 108 Ohio App.3d 709, 715, 671 N.E.2d 623. See, also, *Cleveland v. Wirtz* (July 29, 1993), Cuyahoga App. No. 62751, 1993 WL 290011. The trial court in the case at bar did not err in allowing the interrogatory answers to be introduced as evidence on rebuttal.

■ {¶ 57} Even if that evidence had been admitted improperly, however, its introduction would be harmless error if the railroad does not meet the high standard enunciated in Civ.R. 61:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard

any error or defect in the proceeding which does not affect the substantial rights of the parties.

Civ.R. 61. The railroad has failed to show that the admission of the objected-to rebuttal testimony affected the railroad's substantial rights. The railroad has the right to rebut any evidence against it. It argued at trial that because its expert witnesses were no longer available for questioning on the interrogatory answers, its substantial rights were violated. As the workers' counsel pointed out, however, neither of the railroad's experts was affiliated with the railroad at the time these interrogatories were answered. They would not be able, therefore, to testify concerning the answers.

{¶ 58} Further, the workers had already introduced sufficient evidence in their case-in-chief with the records of the Association of American Railroads from 1932 to show that even if the railroad lacked actual notice of the dangers of asbestos, it had constructive notice: that is, it should have known that asbestos was a dangerous substance and that its workers were at risk. An appellate court may not reverse a judgment if it finds that the errors in the case were not prejudicial to the losing party. App.R. 12(B). The admission of the rebuttal testimony did not affect a substantial right of the railroad. Civ.R. 61. The admission of the interrogatory answers, if error at all, therefore, would be harmless error. Accordingly, this assignment is overruled.

{¶ 59} For its sixth assignment of error, the railroad states:

The trial court erred when it permitted Mr. Seaford to recover damages for his alleged fear of cancer claim.

{¶ 60} The railroad claims that one of the workers, Ralph Seaford, should not have been permitted to recover on his fear-of-cancer claim. It argues that Seaford did not exhibit sufficient fear to justify an award.

{¶ 61} The United States Supreme Court recently addressed this issue in asbestos cases in *Norfolk & W. Ry. Co. v. Ayers,* 538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261. Once a worker has developed asbestosis, the court held, he may recover for a sincere fear of later developing cancer. "We affirm only the qualification of an asbestosis sufferer to seek compensation for fear of cancer as an element of his asbestosis-related pain and suffering damages. It is incumbent upon such a complainant, however, to prove that his alleged fear is genuine *and serious.*" (Emphasis added.) Id. at 157, 123 S.Ct. 1210, 155 L.Ed.2d 261. The court declined, however, to define the terms "genuine and serious" in this context. Id. at 158, 123 S.Ct. 1210, 155 L.Ed.2d 261. The *Ayers* court noted that the dissenting opinions varied in their interpretation of what constituted "genuine and serious." Because the definition of those terms had not been discussed in the

case, the court stated that it therefore resisted ruling on it that day. Id. at fn. 17.[5]

{¶ 62} We are guided by a review of cases cited by the court in *Ayers*. In *Devlin v. Johns–Manville* (1985), 202 N.J.Super. 556, 495 A.2d 495, the court held that plaintiffs will be required to provide the following at trial to recover for their alleged fear:

1. Plaintiff is currently suffering from serious fear or emotional distress or a clinically diagnosed phobia of cancer.

2. The fear was proximately caused by exposure to asbestos.

3. Plaintiff's fear of getting cancer due to their [sic] exposure to asbestos is reasonable.

4. Defendants are legally responsible for plaintiff's exposure to asbestos. [See *Arnett v. Dow Chemical Co.* No. 720586 (Cal.Super.Ct. March 21, 1983)].

Id. at 563, 495 A.2d 495.

{¶ 63} In the case at bar, the only element in dispute here is, as the *Devlin* court put it, whether the worker is currently suffering from a "serious fear" or "emotional distress." The court further noted that "a plaintiff can testify to his fear, preoccupation and distress resulting from the enhanced risk of cancer about which he has been informed." Id. Here, the worker's testimony consisted of a single statement describing his reaction to his increased risk of developing cancer once he developed asbestosis: "I worry about it and the family is concerned about it."

{¶ 64} Because plaintiff's one-sentence statement does not express "serious fear" or "emotional distress," the railroad argues that "worry" does not rise to the level of "fear" and does not express a "serious" enough emotion to justify an

---

5. {¶ a} The court stated:

{¶ b} Considering the dissents' readiness to "develop a federal common law" to contain jury verdicts under the FELA, see *post*, at 5, 11–12, 16 [538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261] (KENNEDY, J.); *post*, at 6 [538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261] (BREYER, J.), it is curious that the principal dissent nevertheless questions the "basis in our FELA jurisprudence" for the requirement that claimants prove their alleged fear to be "genuine and serious," see *post*, at 15 [538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261] (internal quotation marks omitted). In contrast to the principal dissent, JUSTICE BREYER appears ultimately to advance only an elaboration of the requirement that the plaintiff prove fear that is "genuine and serious." He would specify, additionally, that the fear "significantly and detrimentally affec[t] the plaintiff's ability to carry on with everyday life and work." *Post*, at 6 [538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261]. That elaboration, JUSTICE BREYER maintains, is "consistent with the sense of the common law." *Ibid.* The definition JUSTICE BREYER would give to the terms "genuine and serious" in this context was not aired in the trial court or in this Court. See *supra*, at 4, 9, 19 [538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261]. We therefore resist ruling on it today.

award for fear of cancer. We agree. Nothing in the worker's testimony indicates that his fear qualified as serious or that he suffered emotional distress.

{¶ 65} This brief statement is the only time in the trial that plaintiff addresses the basis for any award to recover for his fear of cancer. The first question is how to understand his "worry" when he gives us no details, only the word "worry."

{¶ 66} The question is whether Seaford's "worry" and his observation of his family's "concern" are the equivalent of "serious fear," here, specifically of developing cancer. Webster's New World Dictionary provides a discussion of the difference between these three words: "Concern suggests mental uneasiness over someone or something in which one has an affectionate interest" as in "I feel concern for their welfare." "Worry" suggests mental distress or agitation over some problem as in "his chief worry was that he might fail." "[F]ear is the general term for the anxiety and agitation felt *at the presence of danger*." (Emphasis added.) In its discussion of synonyms of "fear," the dictionary lists "dread," "alarm," "fright," "terror," and "panic." It is that sense of danger that distinguishes "serious fear" from "worry," including a worry based on a family's "concern."[6]

{¶ 67} Other cases the United States Supreme Court cited in the *Ayers* case include *Eagle–Picher Industries., Inc. v. Cox* (Fla.App.1985), 481 So.2d 517, which notes that a worker who had witnessed a friend with asbestosis die from cancer resulting from the asbestos exposure had a valid claim for fear of cancer. See, also, *Coffman v. Keene Corp.* (1992), 257 N.J.Super. 279, 608 A.2d 416, in which the court found the worker's fear valid, noting that "his fright is magnified by the experience of his brother-in-law, who had physically wasted and died from cancer brought on by asbestosis." Id. at 294, 608 A.2d 416. No such circumstances are reported in the case at bar.

{¶ 68} The railroad states that the trial court should have directed a verdict in its favor on this issue, or, in the alternative, that the jury's verdict was against the manifest weight of the evidence. We agree.

Under Civ.R. 50(A)(4), a court may properly grant a motion for directed verdict when, after construing the evidence most strongly in favor of the party against whom the motion is directed, it finds that reasonable minds could come to but one conclusion on a determinative issue, and the conclusion is adverse to the non-moving party. Review of the grant or denial of a motion for directed verdict is de novo. In evaluating the grant or denial of a JNOV, a reviewing

---

6. Seaford, moreover, never expressly identified his worry as based on his family's concern; he might merely have been reporting his family's response.

court applies the same test as that applied in reviewing a motion for a directed verdict.

(Footnotes omitted). *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 72002-Ohio-6803, 83 N.E.2d 920, ¶ 14.

{¶ 69} A directed verdict is appropriate when reasonable minds could determine that the evidence is insufficient to support a verdict against the party moving for directed verdict. Here, nothing in the record supports a finding that the worker's "worry" or his family's "concern" reached the level of "emotional distress" or "serious fear" required by *Ayers* to support a claim of fear of cancer.

{¶ 70} We conclude, therefore, that the evidence was insufficient to support the award to Seaford for a fear-of-cancer claim. Accordingly, this assignment of error is sustained.

{¶ 71} For its seventh assignment of error, the railroad states:

The trial court erred when it denied appellant the right to a set-off of damages in this FELA action.

{¶ 72} The railroad argues in its appellate brief that because the workers reached a settlement with the asbestos manufacturers, the court should have set off the amount they received from the manufacturers from the total they were awarded. To rule otherwise, they say, would allow the workers to receive a larger recovery than the jury had determined was due.

■■■ {¶ 73} The only setoff permitted in a FELA case is one reached between the plaintiff and another tortfeasor before the judgment against the FELA defendant is rendered. The *Ayers* court explained alternate solutions when it noted that federal and state reporters have related that "FELA defendants may bring indemnification and contribution actions against third parties *under otherwise applicable state or federal law.*" (Emphasis added.) Id., 538 U.S. at 162, 123 S.Ct. 1210, 155 L.Ed.2d 261.

■■■ {¶ 74} The record in the case at bar indicates that the workers settled with various manufacturers prior to the judgment in the case at bar.[7]

Our analysis of the merits begins by recognizing that third-party actions for contribution arising out of FELA claims are governed by state law. *Denicola v. G.C. Murphy Co.*, 562 F.2d 889, 895 (3d Cir.1977); *Kennedy v. Pennsylvania Railroad Co.*, 282 F.2d 705, 709 (3d Cir.1960); see also *Alabama Great Southern Railroad Co. v. Chicago & Northwestern Railway Co.*, 493 F.2d 979, 983 (8th Cir.1974) (citing cases). Here, the question of which state's law

---

7. See Plaintiff's Response to Defendant's Motion to Stay Entry of Judgment and Motion for Setoff filed November 20, 2002.

applies is of crucial significance. If Indiana law applies, Conrail has no right to contribution. *Jackson v. Record*, 211 Ind. 141, 5 N.E.2d 897, 898 (1937); *Elcona Homes Corp. v. McMillan Bloedell, Ltd.*, 475 N.E.2d 713, 715 (Ind.Ct. App.1985); Ind.Code Ann. § 34-4-33-7 (Burns Supp.1986). If Pennsylvania law applies, Conrail possesses a right of contribution among joint tortfeasors. *Elder v. Orluck*, 511 Pa. 402, 515 A.2d 517, 519 (Pa.1986); *Rivera v. Philadelphia Theological Seminary* [510 Pa. 1], 507 A.2d 1, 12 (Pa.1986); 42 Pa. Cons.Stat. § 8324 (1982).

*Shields v. Consol. Rail Corp.* (C.A.3, 1987), 810 F.2d 397, 399. Whether the railroad is entitled to contribution, therefore, depends upon the law of the state.

{¶ 75} It is not the law of the state in which the trial is held that is controlling, however, but the state in which injury occurred. As the *Shields* court noted, "Section 379a [redrafted as § 146] of the new Restatement provides: 'In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state will govern.'" (Bracketed insert by circuit court.) Id., 810 F.2d at 399–400, quoting *Griffith v. United Air Lines, Inc* (1964), 416 Pa. 1, 15, 203 A.2d 796. In the case at bar, therefore, the issue of contribution depends upon the law of North Carolina, or whatever state is determined to have the most significant relationship with the occurrence that caused the injury. This portion of the setoff issue, therefore, is remanded for the trial court to apply the appropriate state law.

{¶ 76} Although neither party raised it as an issue, we take judicial notice of an error by the trial court. The trial court included an interrogatory to the jury asking what percentage of injury to plaintiff Thomas was a result of his employment at Duke Power. Because the jury determined that Duke Power was responsible for one-third of Thomas's asbestos-related injuries, the court initially reduced Thomas's award by one-third. The court subsequently increased Thomas's award to the total amount the jury ascribed to his pain and suffering and medical expenses and eliminated the one-third reduction attributable to a different employer. In its nunc pro tunc entry of July 3, 2003, however, made effective November 22, 2002, the court again reduced the amount by one-third. This reduction was an error because no actual settlement with Duke Power existed at the time of the judgment.

{¶ 77} The statutory language of FELA does not support future or anticipatory setoffs for amounts that might be received in the future by the workers from nonrailroad sources. The United States Supreme Court noted in *Ayers*, supra:

> The statutory language, however, supports the trial court's understanding that the FELA does not authorize apportionment of damages between railroad and

nonrailroad causes. Section 1 of the Act, to which we earlier referred, see supra, at 144–146 [123 S.Ct. 1210, 155 L.Ed.2d 261], provides:

"Every common carrier by railroad while engaging in [interstate commerce], shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury * * * resulting in whole or in part from the negligence of * * * such carrier * * *." 45 U.S.C. § 51.

Id., 538 U.S. at 159–160, 123 S.Ct. 1210, 155 L.Ed.2d 261.

{¶ 78} Further, the *Ayers* court found: "Nothing in the statutory text instructs that the amount of damages payable by a liable employer bears reduction when the negligence of a third party also contributed in part to the injury-in-suit." Id. at 160, 123 S.Ct. 1210, 155 L.Ed.2d 261. See, also, *Hess,* supra.

{¶ 79} In very strong language, the United States Supreme Court stated that the railroad's argument that Section 1 requires apportionment "would put that provision in tension with the rest of the statute." 538 U.S. at 161, 123 S.Ct. 1210, 155 L.Ed.2d 261. The court acknowledged, however, that "the Act expressly directs apportionment of responsibility between employer and employee based on comparative fault." But the court immediately went on to caution: "The statute expressly provides no other apportionment." Id.

{¶ 80} "[T]o narrow employer liability without a textual warrant," the court emphatically declared, was "inconsistent with the Act's overall recovery facilitating thrust." Thus the court found the railroad's plea "an untenable reading of the congressional silence." Id. at 161, 123 S.Ct. 1210, 155 L.Ed.2d 261. The court also observed that in a century of FELA jurisprudence, "[n]o FELA decision made by this Court so much as hints that the statute mandates apportionment of damages among potentially liable tortfeasors." Id. at 161, 123 S.Ct. 1210, 155 L.Ed.2d 261.

{¶ 81} In the case at bar, the trial court was asked to apportion damages between two employers. *Ayers* clearly held that FELA admits apportionment between an employer and employee based on comparative fault, but not, however, between employers. In fact, *Ayers* expressly held that "reading the FELA to require apportionment would handicap plaintiffs and could vastly complicate adjudications, all the more so if, as Norfolk sometimes suggests, * * * manufacturers and suppliers, as well as other employers, should come within the apportionment pool." Id., 538 U.S. at 165, 123 S.Ct. 1210, 155 L.Ed.2d 261. The court concluded, therefore, that "[u]nder the FELA, an employee who suffers an 'injury' caused 'in whole or in part' by a railroad's negligence may recover his or her *full damages from the railroad, regardless of whether the injury was also caused 'in part' by the actions of a third party.*" (Emphasis added.) Id. at 165–166, 123 S.Ct. 1210, 155 L.Ed.2d 261. The court clearly held that "[n]othing in

the statutory text instructs that the amount of damages payable by a liable employer bears reduction when the negligence of a third party also contributed in part to the injury-in-suit." Id. at 160, 123 S.Ct. 1210, 155 L.Ed.2d 261.

{¶ 82} The trial court erred, therefore, when it reduced one-third of the award to Thomas for the percentage of injury he incurred while working at Duke Power. The court is ordered, therefore, to reinstate Thomas's full $64,000.

{¶ 83} The trial court is further ordered to determine whether the appropriate state law permits any setoff and to apply that law to the prior settlement Seaford and Thomas reached with the asbestos manufacturers.

{¶ 84} The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

TIMOTHY E. McMONAGLE, J., concurs.

KENNETH A. ROCCO, J., concurs in part and dissents in part.

KENNETH A. ROCCO, J., concurring in part and dissenting in part.

{¶ 85} I concur in part with the result reached by the majority opinion, and I dissent in part. I write separately to address some areas of particular concern to me.

{¶ 86} First, I believe that the common pleas court abused its discretion by denying the motion to dismiss on grounds of forum non conveniens. The doctrine of forum non conveniens, "which allows a court having proper jurisdiction to dismiss an action when to do so would further the ends of justice and promote the convenience of the parties, [is] an inherent power of the trial court, resting within its sound discretion." *Chambers v. Merrell–Dow Pharmaceuticals, Inc.* (1988), 35 Ohio St.3d 123, 125, 519 N.E.2d 370. The criteria the court should consider are generally divided into the private interests of the litigants and the public interest of the courts and citizens of the forum.

{¶ 87} "Important private interests include: 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained.'" *Chambers,* 35 Ohio St.3d at 126–127, 519 N.E.2d 370, quoting *Gulf Oil Corp. v. Gilbert* (1947), 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055. Although "the

plaintiffs' choice of forum should rarely be disturbed," *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839, 91 L.Ed. 1055, particularly when the plaintiff has chosen his home forum, "[b]ecause the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Piper Aircraft Co. v. Reyno* (1981), 454 U.S. 235, 256, 102 S.Ct. 252, 70 L.Ed.2d 419.

{¶ 88} In this case, although depositions of treating doctors had to be taken in North Carolina and medical records had to be sought from there, none of the corporate records were located in North Carolina, and all of appellant's own witnesses were from Ohio and Texas. It does not appear that the convenience of the parties and witnesses could be better served in one forum than another.

{¶ 89} "Public interest factors to be considered include the administrative difficulties and delay to other litigants caused by congested court calendars, the imposition of jury duty upon the citizens of a community which has very little relation to the litigation, a local interest in having localized controversies decided at home, and the appropriateness of litigating a case in a forum familiar with the applicable law." *Chambers,* 35 Ohio St.3d at 127, 519 N.E.2d 370.

{¶ 90} While the Ohio courts are undoubtedly extremely familiar with asbestos litigation under the FELA, the connection between this litigation and Ohio is otherwise extremely tenuous, based only on the fact that Norfolk Southern does business here. The efficiency of conducting all asbestos litigation in a few fora that have become experts in such matters should not override the general interest in deciding local controversies locally. Our federal system was not designed for efficiency, but for maximum local autonomy. Making Ohio bear the burden of conducting asbestos litigation from other states simply because it is familiar with this type of litigation is unfair. Therefore, I would find that the court abused its discretion by overruling the motion to dismiss on grounds of forum non conveniens.

{¶ 91} However, dismissal is not an appropriate remedy at this juncture. If we vacated the judgment and dismissed the case at this point, we would erase the results of a lengthy proceeding. That result would not remedy the harm appellant has already suffered because of the increased cost and inconvenience of litigating here. Therefore, although I believe that the denial of appellant's motion to dismiss was an abuse of discretion, I would not reverse on that basis.

{¶ 92} Second, I must disagree with the majority's determination that the common pleas court should not have allowed the jury to consider appellees' claim for fear of developing cancer. The majority concludes that his "worry" and his family's "concern" that he would develop cancer is not the equivalent of "serious fear." Such a position rewards plaintiffs who can express their fears dramatically, while penalizing the stoic. "Worry," "concern," and "fear" are all synonyms.

See New American Roget's College Thesaurus (1985) 638 ("Worry, *n.* care, anxiety, mental anguish, uneasiness, fear, apprehension; concern, misgiving"). One would not "worry" or be "concerned" if one were not afraid.

{¶ 93} It is incumbent on the claimant to prove that his fear is "genuine and serious," *Norfolk & W. Ry. Co. v. Ayers* (2003), 538 U.S. 135, 157, 123 S.Ct. 1210, 155 L.Ed.2d 261, but this does not mean that the fear must be debilitating, as the majority apparently suggests. Rather, I would construe the phrase "genuine and serious" to mean that fear of cancer is compensable if it is real and fact-based. Here, Seaford testified that his doctors told him that he had an increased risk of developing cancer, that he worried about it, and that his family was concerned. In my view, this testimony was sufficient to support the court's decision to allow this issue to go to the jury.

{¶ 94} Finally, I disagree with the majority's decision to remand this matter for further proceedings with respect to the question whether the settlements appellees actually received from the asbestos manufacturers should be set off against the judgment in this case. A railroad is liable for the whole injury suffered by an employee under the FELA, and that liability is not subject to apportionment. *Ayers*, 538 U.S. at 159–60, 123 S.Ct. 1210, 155 L.Ed.2d 261. However, if the employee has actually recovered some of the damages from another source, the amount of the uncompensated damages actually suffered by the employee has been reduced. To compensate the employee for the entire loss would result in a windfall. See *Schadel v. Iowa Interstate RR., Ltd.* (C.A.7, 2004), 381 F.3d 671 (judgment against a railroad on a claim under the FELA was properly reduced by the amount of a settlement of a claim against another tortfeasor).

{¶ 95} *Schadel* makes clear that federal, not state, common law governs the question whether a setoff should be permitted and that the federal rule requires a pro tanto reduction of the judgment by the amount of a settlement.[8] Accordingly, I would affirm the common pleas court's judgment, but would remand for the common pleas court to reduce the amount of damages awarded to appellees by the amount of the settlements received by the appellees from the asbestos manufacturers.

---

**8.** If the law of North Carolina does apply, that would be a further reason for hearing the matter in North Carolina. See the previous discussion of forum non conveniens.