**Thurston HENSLEY,**

v.

**CSX TRANSPORTATION, INC.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Feb. 6, 2008 Session at the University of Tennessee College of Law.[1]

March 14, 2008.

Opinion and Order on Petition for Rehearing April 3, 2008.

Permission to Appeal Denied by Supreme Court Nov. 17, 2008.

1. ·Oral argument was heard in this case before law students at the University of Tennessee College of Law as a part of the Court's annual Docket Day at the College.

Gareth S. Aden and Christopher W. Cardwell, Nashville, Tennessee; Randall A. Jordan, Grant Buckley, Karen Jenkins Young, and Christopher R. Jordan, St. Simons Island, Georgia; and H. Dean Clements, Chattanooga, Tennessee, for the appellant, CSX Transportation, Inc.

H. Douglas Nichol, Knoxville, Tennessee, and Joseph D. Satterley, Louisville, Kentucky, for the appellee, Thurston Hensley.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which SHARON G. LEE, J., and NORMA McGEE OGLE, Sp. J., joined.

Thurston Hensley ("Employee") sued CSX Transportation, Inc. ("Railroad") pursuant to the Federal Employees Liability Act ("FELA"), 45 U.S.C. §§ 51–60 (2008), alleging that he contracted toxic encephalopathy and asbestosis in the course and scope of his employment as an electrician with Railroad. The case was tried to a

jury, which found in favor of Employee and awarded him $5,000,000 in compensatory damages. Railroad appeals, alleging that the trial court erred in the following ways: by directing a verdict against it on the Railroad's statute of limitations defense; by charging the jury with divergent standards of negligence and causation with regard to Railroad's negligence and Employee's negligence; by giving the jury a verdict form that, according to Railroad, predetermined the issue of whether Employee actually had the diseases he claims; by failing to instruct the jury that a plaintiff's fear of cancer must be "genuine and serious"; by failing to declare, as a matter of law, that Employee's evidence did not satisfy that standard; and by failing to declare a mistrial because of Employee's closing argument, which Railroad claims was inflammatory. We reject all of Railroad's arguments. Accordingly, we affirm.

## I.

Only a very brief outline of the facts is needed here; additional details will be discussed as appropriate in our analyses of the issues raised by Railroad. Employee began working as an electrician for Railroad in 1971. His work exposed him to asbestos and to a cleaning agent called Dowclene. These exposures form the basis of Employee's lawsuit against Railroad. Employee claims that repeated, long-term, high-dose exposure to these substances caused him to contract asbestosis, a lung disease, and toxic encephalopathy, a brain disease. Employee presented evidence that Railroad was aware for years of the dangers posed by asbestos and Dowclene, but that it still exposed him to them, failed to educate him about the risks and failed to provide adequate safeguards to ensure that his working conditions were safe. Railroad denies all of the operative allegations of the complaint. Specifically, it contends that Employee does not have either

asbestosis or encephalopathy; that his exposure to asbestos and Dowclene was minimal and non-damaging; that whatever physical ailments he has were not caused by such exposure; and that Employee *was* educated about the risks and that proper safety procedures *were* followed. The jury sided with Employee. Railroad appeals.

■ State and federal courts have concurrent jurisdiction over FELA claims. *See* 45 U.S.C. § 56. "In FELA cases tried in state courts, the applicable state rules generally govern procedural matters, while federal law controls as to all matters of substantive law." *Jennings v. Illinois Cent. R.R. Co.,* 993 S.W.2d 66, 70 (Tenn.Ct. App.1998). State procedural rules give way to federal law if "application of [state] rules would interfere with a party's substantive federal rights or defenses." *Pomeroy v. Illinois Cent. R.R. Co.,* No. W2004–01238–COA–R3–CV, 2005 WL 1217590, at *12 (Tenn. Ct.App. W.S., filed May 19, 2005) (citing *Brown v. W. Ry. of Ala.,* 338 U.S. 294, 296, 70 S.Ct. 105, 94 L.Ed. 100 (1949)).

■ The United States Supreme Court has held that a jury verdict in a FELA case is entitled to great weight on appeal. *See Biddle v. Norfolk S. Ry. Co.,* No. E1999–025840–COA–R3–CV, 2000 WL 1185575, at *6 (Tenn. Ct.App. E.S., filed August 22, 2000); *Gentry v. Norfolk S. Ry. Co.,* No. 03A01–9610–CV–00341, 1997 WL 406377, at *3 (Tenn. Ct.App. E.S., filed July 22, 1997). "Only when there is a complete absence of probative facts to support the conclusion reached (by the jury) does a reversible error appear." *Dennis v. Denver & Rio Grande W. R.R. Co.,* 375 U.S. 208, 210, 84 S.Ct. 291, 11 L.Ed.2d 256 (1963) (*quoting Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946)). Thus, where Railroad challenges the sufficiency of the evidence to support

an aspect of the jury's verdict, we may not re-weigh the evidence or assess the credibility of witnesses in reaching a conclusion contrary to the verdict. *Lavender,* 327 U.S. at 652–53, 66 S.Ct. 740. Our "function is exhausted when [the verdict's] evidentiary basis becomes apparent, it being immaterial that the [reviewing] court might draw a contrary inference or feel that another conclusion is more reasonable." *Id.* at 653. This is essentially the standard of review for jury cases under Tennessee law, pursuant to which we are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all [evidence] that tends to support [the verdict], allowing all reasonable inferences to sustain the verdict, and to discard all [evidence] to the contrary." *Forrester v. Stockstill,* 869 S.W.2d 328, 329 (Tenn.1994) (citation omitted). In short, we must affirm the jury's verdict if there is any material evidence to support it. *Id.*

 In addition to sufficiency questions, Railroad challenges the propriety of some of the jury instructions. Because the substantive law of FELA cases is federal, jury instructions must correctly reflect the controlling federal common law. *Palmer v. Norfolk–Southern Ry. Co.,* No. 03A01–9309–CV–00313, 1994 WL 111037, at *2 (Tenn. Ct.App. E.S., filed March 30, 1994). The determination of whether jury instructions are proper is a question of law to be reviewed by us *de novo* with no presumption of correctness. *See Solomon v. First Am. Nat'l Bank,* 774 S.W.2d 935, 940 (Tenn.Ct.App.1989). "Since the instructions are the sole source of the legal principles needed to guide the jury's deliberations, trial courts must give substantially accurate instructions concerning the law applicable to the matters at issue." *Ladd v. Honda Motor Co.,* 939 S.W.2d 83, 94 (Tenn.Ct.App.1996) (citations omitted).

However, "[j]ury instructions need not be perfect in every detail." *Id.* We must consider the jury charge as a whole, and we will not invalidate it if it fairly defines the legal issues in the case and does not mislead the jury. *See Hunter v. Burke,* 958 S.W.2d 751, 756 (Tenn.Ct.App.1997). The federal courts take a similar approach:

> We review jury instructions as a whole to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision. A judgment on a jury verdict may be vacated when the instructions, viewed as a whole, were confusing, misleading, and prejudicial. It is not error to refuse to give a requested instruction that correctly states the law, as long as the instructions actually given fairly and adequately cover the material issues.

*Jones v. Consolidated Rail Corp.,* 800 F.2d 590, 592 (6th Cir.1986) (citations omitted).

Standards of review for the additional issues raised by Railroad will be discussed as those issues are reached by us. We address each of Railroad's five issues in turn.

## II.

 Railroad first argues that the trial court erred when it directed a verdict for the Employee with respect to Railroad's claim that Employee's suit was filed outside the FELA's three-year statute of limitations. A directed verdict "is appropriate only when the evidence is susceptible to but one conclusion." *Alexander v. Armentrout,* 24 S.W.3d 267, 271 (Tenn. 2000). In reviewing whether a trial court acted properly in directing a verdict, we must "take the strongest legitimate view of the evidence favoring" the party against whom the verdict was granted. *Id.* (*quoting Long v. Mattingly,* 797 S.W.2d 889, 892 (Tenn.Ct.App.1990)). If reasonable

minds could differ as to the conclusions to be drawn from the evidence presented, a directed verdict is not appropriate.

■■■ Employee was diagnosed with toxic encephalopathy and asbestosis on May 24, 2000; he filed suit on January 10, 2002, less than two years later and well within the three-year statute of limitations. However, as Railroad rightly points out, the test for statute of limitations purposes is not necessarily whether a formal diagnosis has occurred. The statute begins to run as soon as the injured party is "in possession of the critical facts" necessary to discover that a potential cause of action exists—namely, "that he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Railroad also correctly notes that an affirmative duty to investigate one's symptoms and their causes arises when a claimant "should have known" that such an investigation was needed; in these cases, the statute of limitations will "start[ ] to run when a reasonable person would know enough to prompt a deeper inquiry[.]" *Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir.1986). The question that must be answered, therefore, is not simply when Employee was first diagnosed with the subject illnesses, but when he first knew—or should have known—of the critical facts: (1) that he had these illnesses, and (2) that they were caused by Railroad. If he knew or should have known the critical facts prior to January 10, 1999, then his action is time-barred.

Railroad contends that the trial court sidestepped this critical timing issue by ruling that the statute of limitations was equitably tolled because of brain damage to Employee—allegedly a symptom of his solvent exposure-during the period when the statute might otherwise have run. Although it is unclear to us whether the trial

court was invoking "equitable tolling" or was simply applying the reasonable—person standard to Employee's circumstances, it is true that Employee's alleged brain damage was initially the court's sole stated rationale for ruling as it did on this point:

> [R]egardless of the cause of this man's condition[,] in terms of his memory, brain functioning, whatever you want to call his deficit, I think that precludes the statute of limitations issue that he knew or should have known of what he complains of in this lawsuit.

However, the court later cited an additional rationale for its conclusion that the statute of limitations had not run on Employee's claim: namely, that the quantum of Employee's pre–1999 knowledge was insufficient to support a finding that he knew or should have known the critical facts, regardless of whether he was suffering brain damage during the period in question. The court stated:

> I have really already ruled that I don't believe, given the factual scenario of this case if nothing else, that somebody with brain damage could have known or should have known.

> \* \* \*

> I remember also that besides my feeling about it as known or should have known, that his first symptoms, if I'm not mistaken, were headache and bloating. Certainly as I remember the proof, that was not classic symptoms of [toxic encephalopathy]. I don't know that with this big of a disputed and complicated diagnosis that any of us would have known that bloating and headaches could be a problem. If my recollection of the proof is correct, [and] I stand to be corrected, that's what I'm going to rule on that.

Railroad's attorney did not take up the trial judge's offer to "correct[ ]" her "recol-

lection of the proof"—probably because the court's recollection was accurate, as will be seen.

■ We believe this second rationale for the trial court's conclusion on the statute of limitations issue is more convincing than the "brain damage" rationale. Accordingly, we decline to address Railroad's arguments with respect to the trial court's "brain damage" theory, since the lower court's ruling will stand so long as the second theory is adequately supported. We "will affirm a decree correct in result, but rendered upon different, incomplete, or erroneous grounds." *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986). *See also Shutt v. Blount*, 194 Tenn. 1, 249 S.W.2d 904, 907 (1952) ("if the Trial Judge reached the right result for the wrong reason, there is no reversible error").

As the trial court noted, the only evidence presented by Railroad that might be seen as tending to establish *both* "critical facts"—Employee's claimed illnesses and their purportedly work-related cause—relates to two particular symptoms: headaches and bloating. Yet although there was evidence that Employee had these symptoms prior to 1999 and suspected that they might be work-related, no evidence was presented that they *were* work-related, *i.e.*, that they actually resulted from Employee's exposure to solvents or asbestos, or that they are in fact symptoms of Employee's encephalopathy or asbestosis. Indeed, Employee's doctor, Michael Kelly, while under cross examination by Railroad's counsel, conceded that the headaches were *not* a symptom of solvent exposure:

Q: Mr. Hensley told you he has constant headaches.

A: He does have headaches.

Q: And I think you'll agree with me that headaches are not a symptom of—a

chronic symptom of exposure to solvents.

A: You wouldn't expect them to be, correct.

Further, as Employee notes in his brief, "No witness testified that the bloating was the result of chemicals at all." In its reply brief, Railroad does not contest this point, and appears to concede the "headaches" issue, describing Employee's "belief of a link" between headaches and solvent exposure as "incorrect." This is crucial, because Railroad's argument relies heavily upon testimony that Employee was urged by fellow employees and by his wife to see a "poison doctor" *for his headaches and bloating.* There is no evidence that anyone urged Employee to see a "poison doctor" about his other, ultimately more relevant symptoms (*e.g.*, dizzy spells, cognitive problems, shortness of breath), nor is there any other evidence to suggest that Employee knew or should have known that *those* symptoms were work-related. Railroad's argument fundamentally rests upon the notion that Employee knew or should have known that his headaches and bloating were work-related-even though, according to this record, they were not.

■ Railroad says this is immaterial. "It matters not whether Plaintiff was correct in his belief that the headaches were caused by solvents," Railroad argues in its brief. "The legal issue is whether his belief raised a duty to investigate, thus triggering the running of the statute of limitations." We disagree with this logic insofar as it appears to suggest that knowledge of *any* purportedly work-related symptom—even if ultimately proven non-work-related and, in any event, irrelevant to the claims at issue—gives rise to a general duty to investigate one's physical condition, which in turn causes the statute of limitations to run with regard to any and all unknown work-related injuries that may happen to

exist contemporaneously with the known, non work-related injury. This seems to us the necessary implication of Railroad's argument, and we cannot accept it. Contrary to Railroad's contention, we hold that it *does* matter whether the condition that a plaintiff is under a duty to investigate is the same condition that he is seeking damages for. The duty to investigate is, at least broadly speaking, condition-specific. A defendant cannot rely on a plaintiff's prior erroneous belief that a different, unrelated condition was work-related in order to retroactively trigger the statute of limitations on the far more serious condition that the plaintiff ultimately discovers and for which he sues.

■ If Employee were suing for damages caused by his headaches and bloating, his action might well be time-barred; certainly under that scenario a fact issue for the jury would have been created. However, he is not suing for "headaches and bloating," but rather for damages caused by toxic encephalopathy and asbestosis. There is absolutely no evidence linking his headaches or bloating to these conditions, nor any evidence suggesting that his pre-1999 knowledge of *actual* encephalopathy and asbestosis symptoms—such as cognitive problems and shortness of breath— was coupled with knowledge sufficient to put him on notice of a connection between *those* symptoms and his work for Railroad. Nor do we believe that the evidence presented regarding Employee's encephalopathy and asbestosis symptoms could have given rise to a reasonable inference that such constructive notice existed. Perhaps a jury could conclude that Employee had a vague suspicion of his injuries and their causes, but we agree with the Supreme Court of Virginia that "[a]n employee's *mere suspicion* of an injury or its probable cause, standing alone, is not the operative standard for determining when a cause of action accrues under FELA." *Gay v. Norfolk & W. Ry. Co.*, 253 Va. 212, 483 S.E.2d 216, 217 (1997) (emphasis added). For all of these reasons, we conclude that a directed verdict in Employee's favor on this issue was proper. Simply stated, Railroad did not present the evidence needed to establish a statute of limitations defense, and thus there was no factual dispute to be resolved by a jury.

## III.

### A.

Railroad's second argument is that the judgment must be reversed because the jury instructions and verdict form created a "double standard" between, on the one hand, the levels of negligence and causation that Employee was required to prove, and, on the other hand, the levels of *comparative* negligence and causation that Railroad was required to prove. Railroad asserts that such inconsistency was declared improper by the United States Supreme Court in *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007), a case that was decided after the judgment below but before this appeal.

The judge instructed the jury, in pertinent part, as follows:

In this action Mr. Hensley has the burden of establishing by a preponderance of the evidence all the facts necessary to prove the following issues: *Was CSX negligent, even in the slightest;* and did that negligence cause injury to Mr. Hensley; and what damages, if any, is he entitled to.

The defendant, CSX has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: *was Mr. Hensley negligent,* and did that negligence contribute to his injuries.

\* \* \*

If a carrier such as CSX Transportation was negligent and its negligence was a cause *in whole or in part* of Mr. Hensley's injuries, CSX Transportation is liable in damages, although CSX Transportation's negligence was not the sole cause of the injuries and although the negligence of a third person may have contributed in equal, greater, or lesser degree in causing injury.

In deciding this case you must determine the fault, if any, of each of the parties. If you find more than one of the parties at fault, you will then compare the fault of the parties. To do this you will need to know the definition of fault. CSX is at fault if you find that CSX *was negligent, even in the slightest,* and that the negligence was a legal cause of injury to Mr. Hensley. The plaintiff, Mr. Hensley, is a[t] fault if you find that *he was negligent* and that negligence was a legal cause of his injury.

\* \* \*

If you find that *CSX was negligent, even in the slightest, and/or Mr[.] Hensley was negligent* and that this negligence was a legal cause of the injury or damages for which a claim is made, you have found that party to be at fault.

(Emphasis added.) In addition, the verdict form stated as follows:

1. Do you believe from the evidence that CSX was *negligent, even the slightest,* and such negligence was a *cause, in whole or in part,* of the asbestosis the Plaintiff claims?

YES _____ NO _____

2. Do you believe from the evidence that CSX was *negligent, even the slightest,* and such negligence was a *cause, in whole or in part,* of the toxic encephalopathy the Plaintiff claims?

YES _____ NO _____

*If you check "NO" to both numbers 1 & 2, please return to the courtroom.*

3. Do you believe from the evidence that Mr. Hensley was *negligent* and such negligence was a *cause* of his claimed [injuries?]

(Emphasis in paragraphs 1, 2, and 3 added; other emphasis in original).

Railroad argues that these instructions and the jury verdict form are improper under *Sorrell,* a case that arose out of Missouri litigation under FELA in which the instructions stated that the employee is contributorily negligent if his negligence "directly contributed to cause" the injury, *Sorrell,* 127 S.Ct. at 803, while the railroad is judged by whether its negligence "contributed in whole or in part" to the injury. *Id.* at 814. The Supreme Court invalidated that instruction, saying it was based on an incorrect reading of FELA, and declared that "the same standard of causation applies to railroad negligence under Section 1 [of FELA] as to plaintiff contributory negligence under Section 3." *Id.* at 808.

The parties take contrary positions with respect to *Sorrell's* applicability to various aspects of this case, including whether the standards of not just causation, but also negligence (*i.e.,* breach), must be equal. For the sake of argument only, we will assume that Railroad is correct and that the instructions and verdict form in the instant case are improper under *Sorrell.* Railroad still loses this issue because it explicitly conceded the correctness of the trial court's jury instruction on the issue at hand, thereby inviting any error that the trial court may have committed.

### B.

 "Tenn. R. Civ. P. 51.02 provides that a party may seek a new trial

because of an inaccurate instruction, even if it did not object to the instruction at trial." *Grandstaff v. Hawks*, 36 S.W.3d 482, 489 (Tenn.Ct.App.2000). In the instant case, Railroad cited both the jury instructions and the verdict form[2] in its motion for a new trial.[3] However, Railroad cannot claim the protection of Rule 51.02, because Railroad did not merely fail to object at trial to the instructions and form; *it affirmatively acquiesced in them, explicitly asserting that they were legally correct.* The transcript clearly demonstrates this fact:

> [EMPLOYEE'S COUNSEL]: I handed you what really is the verdict—one of the proposed verdict forms, and my point was that the-as to causation, I looked at our causation instructions and the causation instruction I think just needs to be added in whole or in part under—under the claim of negligence, whenever there's a reference to cause, it just should be comma, in whole in or part. Because under FELA law, unlike regular negligence actions, the law is in whole or in part.
>
> [RAILROAD'S COUNSEL:] *I agree with that, Your Honor.*
>
> \* \* \*
>
> [EMPLOYEE'S COUNSEL:] And its negligence was a cause, in whole or in

part. And, really, the theme throughout all the instructions, whenever the question is about cause or causation, should just be that same entry throughout that and that would satisfy the causation aspect of the case.

> THE COURT: Okay.
>
> [EMPLOYEE'S COUNSEL:] The other issue that I think we raised yesterday, Your Honor, I think we're [*i.e.,* Employee and Railroad] probably in agreement on this as well. It relates to the negligence standard.
>
> THE COURT: Okay.
>
> [EMPLOYEE'S COUNSEL:] It's the same type of situation under FELA. It's negligence, comma, even the slightest, comma. Because under the FELA law the burden or the standard is much less than the regular negligence, so whenever Your Honor gives instructions on negligence, it's even the slightest negligence.
>
> THE COURT: Okay.
>
> [EMPLOYEE'S COUNSEL:] I think we're in agreement on that, aren't we, Randy [Railroad's counsel]?
>
> [RAILROAD'S COUNSEL:] Yeah, *I'm fine with that, Your Honor. I don't like it, but it's the law.*

2. We note that, although a party's failure to object is nonfatal with regard to erroneous instructions, *omissions* from jury instructions must be objected to, or the issue is waived. *Rule v. Empire Gas Corp.*, 563 S.W.2d 551, 553 (Tenn.1978). In addition, errors or omissions in a *verdict form* are waived unless objected to at trial. *Keith v. Murfreesboro Livestock Market, Inc.*, 780 S.W.2d 751, 759 (Tenn.Ct.App.1989). However, as will be seen, we hold that Railroad invited error with regard to all of the disputed instructions *and* the verdict form. Thus, we need not decide whether the purported problems with the instructions are properly characterized as errors or as omissions, nor whether Railroad's

objection to other aspects of the verdict form, coupled with its offer of an alternative verdict form that did not contain the language disputed here, is sufficient to establish that Railroad raised the verdict-form issue.

3. Railroad's motion objects specifically to the inconsistent *negligence* standards. The motion makes no specific comment on the inconsistent causation standards. Employee contends that the motion raises only the negligence issue, not the causation issue. As will be seen, we need not decide this question, as we find that both issues were conceded notwithstanding the motion for a new trial.

[EMPLOYEE'S COUNSEL:] It's amazing. I like it when lawyers know the law. And Randy, obviously, has handled enough of these railroad cases that [he knows] that's the law and we're stuck with it.

\* \* \*

[EMPLOYEE'S COUNSEL:] [I]f Your Honor does decide to give the comparative negligence [instruction] ... the "in whole or in part" part for the railroad doesn't apply to Mr. Hensley.

THE COURT: Correct.

[EMPLOYEE'S COUNSEL:] That's only for the railroad.

THE COURT: That's why I just added on on the top one, the Plaintiff, was CSX negligent in whole or in part and did that negligence cause injury.

[EMPLOYEE'S COUNSEL:] Actually, the negligence is even in the slightest, the causation is in whole or in part.

THE COURT: I'm sorry. All right.

[EMPLOYEE'S COUNSEL:] It's complicated. It took me several years to figure this thing out.

THE COURT: Even in the slightest?

[EMPLOYEE'S COUNSEL:] Even in the slightest.

THE COURT [addressing Railroad's counsel]: Is that—I understand you don't like it, but is that all right with you?

[RAILROAD'S COUNSEL:] *It makes me a little ill every time I hear it, but that's where we are, Judge.*

THE COURT: Okay.

(Emphasis added.)

■ Although Railroad could have overcome a mere failure to object to purportedly erroneous instructions by taking issue with them in its motion for a new trial, its concessions at trial constitute "invited error," which is not so easy to overcome. As this court noted in *Knoxville Cnty. Dev. Corp. v. Bailey,* No. E2004–01659–COA–R3–CV, 2005 WL 1457750, at *5 (Tenn. Ct.App. E.S., filed June 21, 2005), invited error is separate and distinct from mere failure to object under Rule 51.02. We pointed out in *Bailey* that the Tennessee Supreme Court held in a 1937 case—admittedly before the adoption of Rule 51.02—that the rule of invited error applies to jury instructions. *Gentry v. Betty Lou Bakeries,* 171 Tenn. 20, 100 S.W.2d 230, 231 (1937). That statement of law was reiterated in a post-Rule 51.02 case, *Roseberry v. Lippner,* 574 S.W.2d 726, 729 (Tenn.1978), in which the Supreme Court held that an erroneous jury instruction "was invited error, and plaintiff will not be heard to complain on appeal of error which she induced the Court to commit." But the clearest and most directly applicable analysis of the interplay between invited error and Rule 51.02 comes from *Haddock v. Lummus Cotton Gin Co.,* 552 S.W.2d 390, 391 (Tenn.Ct.App.1976), in which this court refused to consider a plaintiff's argument against the validity of an instruction about which he had stated at trial, "The Plaintiff does not object to the instructions as given. We don't think it prejudices the Plaintiff's case.... I have no objection to the charge." The Court of Appeals, after quoting Rule 51.02, stated:

> Admittedly, if Plaintiff had made no comment on the portion of the charge complained of on this appeal, under 51.02 he could assign error to any portion of the charge in this Court. However, since the Plaintiff took affirmative action by asking for permission to amend his theory of the case to conform to the charge of the Court and approved the charge, we hold that Plaintiff's assignment of error in this Court is not authorized by T.R.C.P. 51.02.

The situation is analogous to a party assigning error to a charge which he had requested. After the jury's verdict, it was too late to question the correctness of the charge.

It is, therefore, unnecessary to discuss the cases cited and relied upon by Appellant relating to the correctness of the charge complained of.

*Id.* at 392. The facts of *Haddock* are directly on point with the facts in the instant case. Like the plaintiff in *Haddock*, the defendant here, Railroad, "took affirmative action" by explicitly acquiescing to both the disputed instructions and the verdict form. By saying "I agree with that" and "I don't like it, but it's the law" and "[i]t makes me a little ill every time I hear it, but that's where we are," Railroad, in the words of the *Haddock* court, "approved the charge[s]." After losing the case, Railroad attempted to "unring the bell" in its motion for a new trial, but it was too late. It invited the very error of which it now complains.

### C.

 Admittedly, the issues of invited error and waiver are complicated by the intervening precedent of *Sorrell*. When the United States Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."

*Harper v. Va. Dept. of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). This principle of retroactivity could be weakened by strict application of the rule prohibiting litigants from appealing errors that they invited, or did not object to, at trial, where the error was not apparent prior to the Supreme Court ruling. Such a holding would risk encouraging a flood of frivolous trial objections, since it would create a powerful incentive for attorneys to raise every currently invalid objection that could conceivably be vindicated by an unexpected Supreme Court ruling months or years in the future. On the other hand, completely eviscerating the doctrines of waiver and invited error [4] in all cases wherein the law changes during the pendency of an appeal would undermine the important purposes of those doctrines. This latter point was implicitly recognized by the Tennessee Supreme Court in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992), the landmark case that replaced contributory negligence with comparative negligence in Tennessee. The High Court declared that "[t]he principles set forth today apply to (1) all cases tried or retried after the date of this opinion, and (2) all cases on appeal *in which the comparative fault issue has been raised* at an appropriate stage in the litigation." *Id.* at 58 (emphasis added). In other words, parties who had not objected at trial to the all-or-nothing contributory negligence scheme were out of luck—even though that scheme was undoubtedly thought to be "the law" when their cases were tried.

4. Waiver and invited error are, as just noted, two distinct legal doctrines. Waiver is applicable to verdict forms and jury-instruction omissions, but inapplicable to erroneous instructions; invited error is applicable to all of the above. However, both doctrines involve situations where a litigant has failed to preserve an issue for appeal, whether through action (inviting error by acquiescing in a decision) or through inaction (waiving an issue by failing to object to a decision). Thus, for purposes of determining whether an intervening change in precedent excuses a litigant's failure to preserve an issue, there is little difference between waiver and invited error; the latter is, for these purposes, essentially just an enhanced version of the former.

Although the court in *McIntyre* did not specifically explain its reasoning with regard to retroactivity, it is likely that the court was cognizant of the fact that a raging debate about the merits of comparative versus contributory negligence had been ongoing well before the decision in *McIntyre,* and Tennessee was one of only a handful of states still using the traditional all-or-nothing approach until *McIntyre* brought Tennessee into line with the majority of other jurisdictions. In other words, it could not be said that the ruling was a *complete* surprise. Although contributory negligence remained the law until *McIntyre,* it was widely known that a change might be coming. Indeed, the court had put everyone on notice of a possible change fifteen years earlier by stating, "We do not deem it appropriate to consider making such a change [from contributory to comparative negligence] unless and until a case reaches us wherein the pleadings and proof present an issue of contributory negligence accompanied by advocacy that the ends of justice will be served by adopting the rule of comparative negligence." *Street v. Calvert,* 541 S.W.2d 576, 586 (Tenn.1976). The Supreme Court quoted this language in *McIntyre* and stated, "Such a case is now before us." 833 S.W.2d at 56. It seems fair, therefore, that the court limited the ruling's retroactivity to those cases where the issue had been raised at trial. In essence, this approach strikes a balance between the important purposes served by retroactivity, on the one hand, and waiver or invited error, on the other.

■ Such a balancing approach was championed by Judge Richard A. Posner of the United States Court of Appeals for the Seventh Circuit when he declared that "[a] party should be allowed to take advantage of a decision rendered during the pendency of his case, even if he had not reserved the point decided, *if the decision could not reasonably have been anticipated.*" *McKnight v. Gen. Motors Corp.,* 908 F.2d 104, 108 (7th Cir.1990) (emphasis added). That last point, we think, is crucial. Closing the door on waived arguments only where the intervening change in precedent "could ... reasonably have been anticipated" respects and adheres to the spirit of both of the competing legal principles, requiring parties to raise all pertinent or potentially pertinent issues at trial but declining to penalize them for failing to raise issues whose resolution in their favor was totally unforeseeable. Moreover, with respect to Judge Posner's expressed fear that universal application of the waiver doctrine "would induce parties to drown the trial judge with reservations," *Id.,* his "could not reasonably have been anticipated" rule is philosophically consistent with Rule 11 of both the federal and Tennessee Rules of Civil Procedure, which prohibit attorneys from making a representation to the court unless "the claims, defenses, and other legal contentions therein are warranted by existing law *or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.*" Tenn. R. Civ. P. 11.02(2) (2007) (emphasis added); *see also* Fed.R.Civ.P. 11(b)(2). The *McKnight* rule avoids creating incentive for attorneys to make arguments that are "frivolous" when raised, but penalizes them for failing to make "nonfrivolous" arguments for changes to the law where such changes could reasonably have been anticipated.

### D.

■ This analysis brings us, of course, to the question of whether the changes wrought by *Sorrell* could reasonably have been anticipated by Railroad. The answer, we think, is clearly yes. In fact, we can go a step further and say that the

changes *were* anticipated. After all, as noted earlier, Railroad complained about the very question at issue here in its motion for a new trial. That motion was filed on October 27, 2006, more than two months *before* the *Sorrell* decision was announced. The law did not change during the 29 days between the above-quoted discussion—in which Railroad's attorney said of the disputed instructions, "I don't like it, but it's the law"—and the filing of Railroad's motion for a new trial, which argued that the instructions were "erroneous statements of the law" that "set[ ] up a clear double standard."

A brief timeline of events will help clarify matters. On May 15, 2006, the United States Supreme Court announced that certiorari had been granted by the Court in the *Sorrell* case to address the following question: "Whether the court below erred in determining that the causation standard for railroad negligence under the Federal Employers Liability Act ('FELA') differs from the causation standard for employee contributory negligence." *Norfolk Southern Ry. Co. v. Sorrell,* 547 U.S. 1127, 126 S.Ct. 2018, 2018, 164 L.Ed.2d 778 (2006) (Mem.); 2005 U.S. Briefs 746, Brief of Petitioner (U.S. S.Ct. Briefs 2006). At that time, the pre-trial phase of the instant case was well underway.

More than three months *after* the Supreme Court agreed to hear *Sorrell,* Railroad in the instant case submitted its proposed jury instructions, which included equivalent standards of causation in Charge No. 13, and also its proposed verdict form, which included equivalent standards of negligence and causation. The trial below began on September 12, 2006.

On September 27, the trial court, in the course of scheduling a discussion of the proposed jury instructions for the following morning, stated:

Well, I mean, [Railroad] may not object [to Employee's proposed instructions]. I mean, they may realize that's the case law. *I don't know the case law that well and I want y'all to make certain there's not error there.*

(Emphasis added.) As can be seen, the trial judge admitted being somewhat unfamiliar with the relevant case law and thus wanted to ensure that both parties had ample opportunity to raise and argue any legal objections they might have to the court's proposed instructions. Yet the next day, September 28, when given that opportunity, Railroad's attorney conceded the instructions' legality, as already noted. He said, "I agree with" the causation instructions on the verdict form; he further stated, "I'm fine with [the negligence standard in the jury instructions] ... I don't like it, but it's the law"; and he admitted that the divergent standards for negligence and contributory negligence "makes me a little ill every time I hear it, but that's where we are, Judge."

The following morning, September 29, shortly before charging the jury, the trial court asked the parties, "Is there any other part of the charge ... Is there anything else you all saw that you didn't like[?]" Railroad's attorney responded that Railroad was satisfied with the instructions, "[w]ith some exceptions that we want to make probably after the charge is given about the Court's failure to give some things that we talked about." The court—clearly wanting to settle any important issues *before* giving the charge—replied, "Besides the fear of cancer charge, is there anything else in particular that you are unhappy about?" Railroad's attorney responded by asking the court to alter an instruction relating to foreseeability, but said nothing about the negligence and causation "double standard." At no point did Railroad indicate that it was "particular[ly] ... unhappy" about that issue, nor indeed

that it was "unhappy" at all. The court subsequently charged the jury with the now-disputed instructions and gave the jury the now-disputed verdict form. When Railroad made its promised exceptions, shortly after the jury was charged, it did *not* except to the court's refusal to give the jury its Charge No. 13, the proposed instruction that would have provided for a uniform causation standard. Railroad *did* except to the court's refusal to use the more detailed verdict form that Railroad had submitted, but this exception appears to have been based on other grounds (specifically, the "fact of disease" issue that we will address in the next section of this opinion). In sum, during the time period between Railroad's concession and the end of the trial, the record shows no indication that Railroad ever told the court it had changed its mind about the previously conceded legality of the now-disputed instructions and verdict-form language.

The jury returned its verdict later that day, September 29. The court's judgment was entered on October 2. Approximately one month later, on October 27, Railroad filed its motion for a new trial. It stated, as one of 16 reasons why a new trial should be granted, that "[t]he Court erroneously charged the jury on the standard of care to utilize in assessing the negligence of [Railroad], and then compounded the error by 1) articulating a separate and different standard of care for assessment of Plaintiff's negligence and 2) emphasizing the errors by restating them on the jury verdict form." The memorandum in support of the motion elaborates on this claim, asserting that the jury was presented with a "clear double standard." Railroad argued in its memorandum as follows:

> In short, the Court's charge presents a relaxed "even in the slightest" negligence standard for defendant [Railroad] but a normal pure "negligence" standard for the Plaintiff.

[Railroad] respectfully submits both aspects of the charge are *erroneous statements of the law* and clearly prejudicial.

(Emphasis added.) It is worth reiterating that, exactly one month earlier, Railroad's attorney had said of the very instruction at issue, "I don't like it, but it's the law." No United States Supreme Court opinion was released during the intervening month that could have converted the instruction's contents from "the law" into "erroneous statements of the law." Rather, it seems that Railroad simply changed its mind. In any event, Railroad's motion for a new trial cites, among other cases, *Page v. St. Louis Southwestern Ry. Co.*, 349 F.2d 820 (5th Cir.1965) in support of its contention that the previously agreed-to instructions were in fact erroneous. Railroad described *Page* as "a clear ruling that the standard of negligence for employee and employer is the same under FELA." This citation is significant because, when *Sorrell* was decided 75 days later, the majority opinion referred to *Page* as "[t]he most thoughtful treatment" of the issue, and essentially adopted *Page's* reasoning.

The Supreme Court released its *Sorrell* opinion on January 10, 2007. Less than two weeks later, on January 23, the trial court in the instant case rejected Railroad's motion for a new trial. The court noted the brand-new *Sorrell* opinion, stating that Railroad had "supplemented [its] argument" by bringing the case to the court's attention. However, the trial court stated that "[a] review of the case does not change the Court's opinion as to the appropriateness of the charge." The court then essentially cited a waiver or invited error theory in support of its decision, noting, "The Court held several jury charge/verdict for[m] conferences with counsel before the charge was communicated to the jury."

Railroad filed its notice of appeal on February 9, 2007. Railroad now argues that the trial court should have used Railroad's proposed instructions, and that, although Railroad subsequently agreed to the instructions that the court used instead, *Sorrell* so fundamentally changed the law that it is unfair to hold Railroad to the normal rules of waiver and invited error. Yet under the test already articulated-whether the change in the law "could ... reasonably have been anticipated"-it is abundantly clear that Railroad cannot now claim the benefit of *Sorrell* after having so explicitly disavowed its legal underpinnings at trial.

### E.

Railroad's briefs are strikingly inconsistent in their characterization of *Sorrell's* impact on the law and, by implication, the foreseeability of the High Court's ruling in that case. On the one hand, Railroad states that *Sorrell* "*confirmed what most courts had already held*—that railroads and employees should be subject to equivalent causation standards in determining negligence[.]" (Emphasis added.) Later, Railroad asserts that *Sorrell* "resolved a long-running split of authority[.]" Yet Railroad goes on to assert that it "should not now be penalized in this appeal because at trial it followed *then-prevailing law* on the standard of causation and negligence for railroad FELA liability." (Emphasis added). Railroad adds that it "could not have invited error because the trial court's ruling was consistent with *the governing law* at the time of trial." (Emphasis added). Needless to say, the notion that Railroad reasonably relied upon settled, "governing," "then-prevailing" pre-*Sorrell* law, which *Sorrell* then unexpectedly overturned, is difficult to square with the assertion that *Sorrell* "confirmed what most courts had already held." In addition, it is difficult to understand how Rail-

road can now rely on the jury instructions that it submitted at trial, before *Sorrell,* as being the proper application of post-*Sorrell* law, yet contend that its acquiescence at trial to the court's instructions should be disregarded because *Sorrell* so drastically and unexpectedly changed the law. If that is the case, why did Railroad submit legally unsupportable instructions? Railroad cannot have it both ways.

The bottom line is this: Railroad was given ample opportunity to argue that its submitted instructions were proper under existing law, including *Page* and the various other cases that represent, in Railroad's words, "what most courts had already held" before *Sorrell.* Presented with this opportunity to convince the trial court of its position, Railroad instead chose—despite having submitted instructions that it claims are now proper—to concede the point, explicitly declaring the court's instructions legally correct. The trial court, which had previously told the attorneys that "I don't know the case law that well and I want y'all to make certain there's not error there," understandably saw no need to pursue this particular issue further. After all, Railroad had conceded the point, and there were many other contested issues to resolve in this complex case. Yet now, having invited the result that it now describes as error, Railroad seeks to revive the issue. This it cannot do. We will not allow Railroad to change its position on appeal after specifically conceding the point in question because of a supposedly drastic change in the law that Railroad should have anticipated, and indeed *did* anticipate (albeit inconsistently). The propriety of negligence and causation instructions that impose a "double standard" on plaintiffs and defendants under FELA was an unresolved legal issue that Railroad needed to preserve at trial if it wished to assert error on appeal, and Rail-

road failed to do so. Therefore, we do not reach the substantive merits of the claim.[5]

## IV.

Railroad's third issue requires a much shorter discussion. Railroad claims that the verdict form improperly presupposes the fact of Employee's claimed diseases, toxic encephalopathy and asbestosis. We quote again from the first two questions on the form, with a different emphasis this time:

> 1. Do you believe from the evidence that CSX was negligent, even the slightest, and such negligence was a cause, in whole or in part, of *the asbestosis the Plaintiff claims?*
>
> YES ____ NO ____
>
> 2. Do you believe from the evidence that CSX was negligent, even the slightest, and such negligence was a cause, in whole or in part, of *the toxic encephalopathy the Plaintiff claims?*
>
> YES ____ NO ____

(Emphasis added.) Railroad argues that the court erred by consolidating the issue of whether Plaintiff has the diseases in with the question of whether Railroad negligently caused those alleged diseases. This is in contrast to Railroad's proposed verdict form, which begins with the questions, "Do you find from a preponderance of the evidence that the Plaintiff suffers from toxic encephalopathy?" and "Do you find from a preponderance of the evidence that the Plaintiff suffers from asbestosis?" Only then does it proceed to ask about negligence and causation. Railroad contends that the court's approach "effectively and erroneously granted Plaintiff a directed verdict on this issue[.]"

We disagree. The necessary first step in answering the questions posed by the verdict form is to decide whether Employee's claims of disease are proven by the evidence. This necessity is implied by the form's language and by common sense, and nothing in the court's language suggests otherwise. The form does not predetermine the question of whether Employee has the diseases; it states only that Employee has made a "claim," not that the claim is true. Merriam–Webster defines the verb "to claim" as meaning "to assert especially with conviction and in the face of possible contradiction or doubt." *Webster's Third New International Dictionary* 414 (1993). Railroad certainly did try to contradict the claims. Indeed, in its closing argument, Railroad argued as follows:

> He doesn't have asbestosis, the disease he has sued CSX for, therefore he can't win that part of this case.
>
> Now, you can dispose of the asbestos piece of this case pretty quickly once you get back in the jury room. You elect a foreperson. One thing you can do is say, all right, let's take a vote. Let's take a quick vote. Do we believe Mr. Hensley has asbestosis or not. If all of you say no, then you're done. You can start talking about solvents.

This is just one example. Both parties made clear, throughout the trial and in closing arguments, that whether Employee suffered from the diseases in question was very much a disputed issue. We see no reason to imagine that the jury was confused about the nature of its duty to determine the facts on these crucial issues, especially given how vigorously each side argued them.

In summary, the verdict form states that Employee *claims* to have the diseases

---

5. We emphasize again that our opinion does not presuppose anything about the outcome of this issue if Railroad had properly preserved it. We simply do not decide that point because Railroad's invited error pretermits it.

in question, and asks the jury to make an overall determination of whether he is entitled to a verdict in his favor on these *claims*. Certainly, the court *could* have broken these questions down into their component parts, but it was not obligated to do so, and its decision to use a more succinct form did no harm to anyone. If the answer to either question (or both) had been "no," we might have been left wondering whether the jury had concluded that the disease did not exist, or rather that it existed but the Railroad was not responsible for it. But the jury answered "yes," which leaves no doubt about what facts they found. It is implausible to suppose that the jury believed Railroad was the negligent cause of a nonexistent disease. In any event, it is reasonable to assume the jury knew the meaning of the word "claim," and, as such, we find no error here.

### V.

In its fourth issue, Railroad argues that Employee's evidence of a compensable "fear of cancer" failed to meet the requirement of *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 157, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003), that it be "genuine and serious," and that the trial court erred by failing to instruct the jury on that standard. We will address the second point first, as it is more easily dispensed with.

█ The Court in *Ayers* held that a complainant with asbestosis can recover damages under FELA for fear of cancer when that fear "stems from a current injury," *id.* at 159, 123 S.Ct. 1210, with the "important reservation" that "[i]t is incumbent upon such a complainant ... to prove that his alleged fear is genuine and serious." *Id.* at 157, 123 S.Ct. 1210. However, the Court declined to go further, specifically limiting its holding to the above-stated narrow issue. As the Missouri

Court of Appeals explained in *Hedgecorth v. Union Pac. R.R. Co.*, 210 S.W.3d 220, 228–29 (Mo.Ct.App.2006), "*Ayers* does not require ... instructions detailing or explaining damages based on a fear of developing cancer.... [T]he Court in *Ayers* did not discuss or authorize jury instructions on this issue, but merely ruled on substantive law." We agree with this analysis of *Ayers*. Railroad does not point us to any other cases containing a requirement that the *Ayers* test or a similar standard be communicated to the jury, nor have we found any. We suspect this is because such a requirement would make little sense.

One purpose of the "genuine and serious" requirement, we believe, is to protect defendants from excessive verdicts based on appeals to jurors' passions with respect to the deeply emotional issue of cancer. Because the mere suggestion of a possibility of cancer has the potential to evoke raw emotions, a juror may be swayed by the barest shred of evidence that a defendant has caused a plaintiff to suffer an increased risk and/or fear of cancer, and may be tempted to overcompensate the plaintiff for such a risk or fear. In light of this reality, little if any purpose would be served by instructing the jury that the plaintiff's fear must be "genuine and serious." Juries do not routinely grant multi-million-dollar awards for injuries that the jurors regard as non-genuine or unserious. Any juror who might be predisposed to grant a large award based on shaky evidence of a fear of cancer is unlikely to be swayed by the language of *Ayers*. Rather, it is for the courts to serve as gatekeepers in this regard, to ensure that fear of cancer claims do not *go* to the jury unless there is credible evidence of a "genuine and serious" fear.

█ That brings us back to the question of whether Employee introduced suf-

ficient evidence to support a fear of cancer claim under *Ayers*. We find that he did. Railroad does not dispute the well-established link between asbestosis and an increased risk of cancer. However, as Railroad correctly notes, establishing that increased risk is not enough; Employee must also prove that he had a genuine and serious fear of cancer. On this point, Railroad makes much of Employee's testimony that he has "some concern" over getting cancer "in the back of my mind," like "a little cloud" hanging over his head. Railroad compares this testimony to the evidence in *Seaford v. Norfolk S. Ry. Co.*, 824 N.E.2d 94, 111–12 (Ohio Ct.App.2004), *rev'd on other grounds*, 106 Ohio St.3d 430, 835 N.E.2d 717 (2005), wherein the plaintiff was denied fear-of-cancer damages under the *Ayers* test because there was no evidence beyond a single, vague statement of "worry" and "concern." However, in the instant case, vague statements of concern do not represent the full extent of Employee's testimony. He also testified that he experiences "anxiety"—a term referenced in *Seaford*, in contrast to mere "worry" and "concern," as part of the dictionary definition of fear: "the general term for the anxiety and agitation felt at the presence of danger." 824 N.E.2d at 112 (quoting *Webster's New World Dictionary*). Employee also testified that he takes Xanax for his anxiety, in part because of his fear of cancer:

Q: For your anxiety, why did [Dr. Perry] give [Xanax] to you? What kind of anxiety do you have that you have to take medicine for?

A: Well, I just feel like, you know, my chest—I get tightness in my chest and can't—I smother and I sit and worry. I think about—you know, this asbestos in my lungs, it's apt to cause—I don't say I've got it, but it's apt to cause cancer of the lungs.

Railroad asserts that "[t]his testimony . . . was subsequently impeached on cross-examination," when Employee testified that he began taking Xanax before being diagnosed with asbestosis. Yet that fact does not necessarily preclude a jury finding that at least *part* of the reason Employee has *continued* to take Xanax is because of his fear of cancer. Such a finding would be a reasonable inference that a jury could justifiably make from the evidence presented. Similarly, Dr. Perry's testimony that he does not know the cause of Employee's anxiety does not, as a matter of law, establish that no jury could possibly conclude that fear of cancer was one of the causes. Railroad's assertion that "there is no evidence that [Employee's] use of medication was in any way related to a concern about getting cancer" is simply incorrect. Employee's testimony is evidence of that proposition; it is the province of the jury to weigh that evidence against the countervailing evidence, including Railroad's attempts to impeach Employee's testimony. We are not empowered to re-weigh the evidence and substitute our judgment for that of the jury. We simply hold that, if the jury reasonably believed Employee's evidence, it could have found that a genuine and serious fear of cancer existed. That is enough to sustain the verdict.

## VI.

Railroad's fifth and final issue—that Employee's closing argument was unduly prejudicial and inflammatory—merits little discussion. Railroad contends that, contrary to FELA's bar on punitive damages, Employee tacitly encouraged the jury to punish Railroad, rather than merely compensating Employee, by making an impermissible "send a message" argument. Having read the transcript of the argument, we agree with Employee that Railroad is taking individual quotes out of context and is painting the argument as

far more inflammatory than it really was. It seems clear to us that Employee's argument was focused on establishing the elements of his claim, and that any rhetorical flourishes were within the boundaries of permissible argumentation. Moreover, we note that the trial court—which, upon hearing the argument first-hand, was in a far better position than we are to assess whether it was prejudicial—found no merit in Railroad's claim that the argument was improper. Such issues are generally left to the trial court's broad discretion. *Doochin v. U.S. Fid. & Guar. Co.,* 854 S.W.2d 109, 115–16 (Tenn.Ct.App.1993). In any event, we too find this claim to lack merit, and thus decline Railroad's invitation to order a new trial on this basis.

### VII.

For all the foregoing reasons, the judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, CSX Transportation, Inc. This case is remanded to the trial court for enforcement of the court's judgment and for collection of costs assessed below, all pursuant to applicable law.

### OPINION AND ORDER ON PETITION FOR REHEARING

Appellant CSX Transportation, Inc. ("Railroad") has filed a petition for rehearing pursuant to the provisions of Tenn. R.App. P. 39. Railroad argues that this court misstated facts related to our holding that the trial court properly directed a verdict in favor of Thurston Hensley ("Employee") on the statute of limitations issue. We stated in our opinion that "no evidence was presented" linking Employee's headaches to his claimed toxic encephalopathy. Railroad points us to several pieces of evidence that it says we overlooked. Having reviewed Railroad's memorandum and the accompanying evidence, we conclude that Railroad is correct that we misstated certain facts and conclusions. However, our holding remains unchanged, as will be explained herein. We adhere to our ruling that the directed verdict was properly granted.

To prove that Employee's action is time-barred, Railroad must establish that, prior to January 10, 1999, Employee knew or should have known both of "the critical facts: (1) that he had [the claimed] illnesses,[1] and (2) that they were caused by Railroad." Because there is no evidence that Employee knew he had toxic encephalopathy until he was diagnosed in May 2000, Railroad necessarily relies on the "duty to investigate" rule—*i.e.,* that Employee "should have known" he had encephalopathy because he had sufficient knowledge of existing symptoms to trigger a duty to investigate those symptoms, which investigation would have revealed the full extent of his illness. At issue on this petition for rehearing is whether the evidence of Employee's pre–1999 knowledge of his headaches, coupled with the newly highlighted evidence of an actual symptomatic link between headaches and toxic encephalopathy, creates a fact issue regarding whether Employee's pre–1999 knowledge meets the first prong of the "critical facts" test.[2] If

---

1. The "illnesses" in question are toxic encephalopathy and asbestosis. Railroad's petition for rehearing relates only to encephalopathy. Our conclusions regarding asbestosis are not implicated by the facts and arguments raised by Railroad in the petition and accompanying memorandum.

2. As to the second prong, we wrote in our opinion that there was no evidence coupling Employee's knowledge of his *non-headache* symptoms with "knowledge sufficient to put him on notice of a connection between *those* symptoms and his work for Railroad." The resolution of this issue is arguably different, however, with regard to the headaches. Al-

the answer is yes, a directed verdict would be inappropriate.

We upheld the trial court's directed verdict on the basis of the following rationale stated by the trial court in a memorandum opinion:

> [Employee's] first symptoms, if I'm not mistaken, were headache[s] [3] ... Certainly as I remember the proof, that was not classic symptoms of [toxic encephalopathy]. I don't know that with this big of a disputed and complicated diagnosis that any of us would have known that ... headaches could be a problem. If my recollection of the proof is correct, [and] I stand to be corrected, that's what I'm going to rule on that.

As we noted in our opinion, Railroad did not seek to "correct" the trial court on that point. Moreover, in its briefs on appeal, Railroad stated that Employee's "belief of a link" between headaches and solvent exposure was "incorrect." Thus, it appeared to us that Railroad was conceding that headaches are not a symptom of encephalopathy.[4] We deemed this purported lack of a link between the symptom and the illness "crucial" for statute of limitations purposes, "because Railroad's argument

relies heavily upon testimony that Employee was urged by fellow employees and by his wife to see a 'poison doctor' for his headaches[.]" Absent that testimony, we held, Railroad could not hope to prove that a duty to investigate arose prior to 1999.

Some language in our opinion appeared to suggest that the purported lack of an evidentiary link between headaches and encephalopathy was itself a dispositive fact. Therefore, Railroad now points us to several items of evidence—originally offered in support of *Employee's* case—that contradict our statement that "[t]here is absolutely no evidence linking his headaches ... to [encephalopathy]." We concede that this was a misstatement. There was indeed evidence in the record linking headaches to encephalopathy. However, this is only a threshold question, not the core issue, and to the extent our opinion suggested otherwise, we erred. The core issue is whether Employee had the requisite knowledge of the claimed illness, *i.e.,* encephalopathy.

It is crucially important to distinguish between Employee's *knowledge of headaches* and his *knowledge of encephalopathy.* Headaches are one of many symp-

---

though "mere suspicion of an injury['s] ... probable cause, standing alone," does not satisfy the second prong, *Gay v. Norfolk & W. Ry. Co.*, 253 Va. 212, 483 S.E.2d 216, 217 (Va. 1997), the prong may arguably be satisfied by the combination of: a) testimony that Employee suspected his headaches were work-related, and b) testimony that his co-workers urged him to see a "poison doctor" because of the headaches. However, we do not so hold. Rather, we do not decide this issue because the absence of the first prong is dispositive.

3. The court actually said "headache and bloating." However, Railroad's memorandum in support of its petition for rehearing explicitly concedes, for present purposes, the issue of bloating. Railroad argues that this court erred with regard to headaches only.

Thus, for ease of understanding, we have deleted references to bloating—inserting ellipses as needed—in this quotation and several quotations that follow.

4. Of course, Railroad disputes basically the entire factual underpinning of Employee's case, including the very notion that he has encephalopathy at all—while simultaneously arguing that if, *arguendo*, Employee has encephalopathy, he should have known about it prior to January 10, 1999. Because of these mutually exclusive factual contentions, Railroad at times walks a thin line between conceding points and arguing them in the alternative. For this reason we have chosen not to reject Railroad's argument on the basis of its apparent prior concession of the point, and will proceed to address the substance.

toms of encephalopathy, and they are also a symptom of many other conditions. Railroad seizes on our statement that "[i]f Employee were suing for damages caused by his headaches ... his action might well be time-barred; certainly under that scenario a fact issue for the jury would have been created." Railroad suggests that this language means we must now declare that a jury issue has indeed been created, since Railroad has pointed us to evidence of a link between encephalopathy and headaches. But we did not say that evidence of a link between encephalopathy and headaches would create a jury issue. We said that a jury issue would exist "[i]f Employee were suing for damages caused by his headaches"—that is to say, if the fundamental basis of his claim was *headaches,* rather than encephalopathy, a very serious disease of which headaches are but one symptom.

In order to create a jury issue, Railroad must cite material evidence that Employee had, or may be charged with, knowledge of encephalopathy, not merely of headaches.[5] Knowledge of headaches is relevant only if it helps establish that Employee "kn[e]w enough to prompt a deeper inquiry" into the cause of the headaches, *Nemmers v. United States,* 795 F.2d 628, 631 (7th Cir. 1986), and in turn, this "deeper inquiry" is relevant only if it would have revealed the headaches' cause to be encephalopathy. Needless to say, if there was no evidence that the headaches were in fact caused by encephalopathy, then no jury could reasonably conclude that a deeper inquiry would have revealed such a causal link. That was the basis for our original ruling on this point. However, although we now reverse that portion of our ruling, our reversal establishes only that the "deeper inquiry" is *relevant* not that Employee knew enough to prompt it. We now turn our attention to this latter point.

In its memorandum opinion, the trial court stated, "I don't know that with this big of a disputed and complicated diagnosis that any of us would have known that ... headaches could be a problem." The statement goes to the core of the issue. Employee is not suing Railroad for mere headaches; he is suing Railroad for a much broader and more serious illness. Headaches are indeed a symptom of that illness, but they are also a symptom of countless other illnesses. Does the mere fact that a person has a single discrete symptom, such as headaches, trigger such a broad duty to investigate that it starts the clock running on any subsequently discovered illness of which headaches are arguably a symptom—no matter how unforeseeably serious that illness might be? We think not.

The duty to investigate is, as we stated in our opinion, "condition-specific." It follows logically that there must be some reasonable relationship between the symptoms complained of and the condition underlying the cause of action, such that the discovery of the symptoms reasonably places the plaintiff on notice that he might have a more serious condition which merits further investigation. Indeed, this conclusion is mandated by the "principle that the statute starts to run when a reasonable person would know enough to prompt a deeper inquiry into a potential cause." *Nemmers,* 795 F.2d at 632. No duty to investigate arises if a reasonable person would not, upon experiencing the symptom in question, reasonably suspect that something is seriously wrong that requires further investigation. Thus, the mere fact

---

**5.** Concededly, we failed to properly emphasize this distinction when we stated in our opinion that "Railroad's argument fundamentally rests upon the notion that Employee knew or should have known that his headaches ... were work-related."

that an objective link between a symptom and a condition can be retroactively established does not necessarily mean that the discovery of the symptom triggered a duty to investigate as to the condition. For instance, a plaintiff with mild congestion that most reasonable people would dismiss as the likely symptom of a head cold is not necessarily placed on immediate constructive notice that he has a nascent case of severe pneumonia. The symptoms must rise to a certain level of seriousness and apparent relatedness before they trigger a duty to investigate that implicates the subsequently-discovered condition.

This does not mean, of course, that Employee's duty was triggered only when he became aware of every single symptom, or when he knew that those symptoms might mean he had encephalopathy. Such a holding would defeat the purpose of the "duty to investigate" rule altogether. However, again, the condition-specific nature of the duty means there must be some reasonable nexus between the symptoms in question and the ultimate diagnosis at issue. We recognize that headaches—in addition to being symptomatic of countless other conditions, of various levels of seriousness—are a possible symptom of encephalopathy. Yet we agree with the trial court that headaches, by themselves, do not necessarily create knowledge of encephalopathy, constructive or otherwise. We interpret the court's statement that "with this big of a disputed and complicated diagnosis ... [none] of us would have known that ... headaches could be a problem" as a holding that no reasonable juror could conclude from this evidence that the headaches, standing alone, created a duty to investigate *vis a vis* the toxic encephalopathy. We concur with this holding. It is for this reason that we do not change our judgment in this case.

The petition for rehearing is denied with costs associated with the petition taxed to the appellant, CSX Transportation, Inc.

IT IS SO ORDERED.